Kremelberg *vs.* Kremelberg.

---

GERTRUDE J. KREMELBERG *vs.* JOHN D. KREMELBERG.

*Proof of Adultery—When Lapse of time in applying for a Divorce, and a deed of Separation between the parties, constitute no bar to the Divorce—Covenant in Deed of Separation for support of the Wife, not vacated by a Decree of Divorce, obtained at the instance of the Husband—When custody of the Children will be awarded to the Father after a Divorce.*

Direct proof of adultery, that is, evidence of eye-witnesses, is not required, for such is the nature of the offence, and the secret and clandestine manner in which it is committed, that such proof is in most cases unattainable; yet where it is sought to be inferred from circumstances, they must lead to the conclusion of guilt by fair and necessary inference.

Under the facts as stated in the opinion of the Court, it was held, that neither the delay on the part of the complainant in making his application for a divorce from his wife for infidelity, of which he had full knowledge for a long time previous, nor the execution of a deed of separation, nor the circumstances under which it was made, whether considered separately or together, constituted any bar to the divorce sought. ( *léxing* ʒ̣ ̣ ̣ *K·G·* )

Where in a deed of separation between husband and wife, the former with full knowledge of the latter's adultery, voluntarily covenants with her father, a party to the deed, to pay to her for her personal

support and maintenance, a certain sum annually during his life, such covenant is not avoided by a divorce *a vinculo matrimonii* obtained at the instance of the husband; it may still be enforced.

Where a husband upon his application is divorced *a vinculo matrimonii* from his wife on the ground of her adultery, the care and custody of the children are properly awarded to the father.

APPEAL from the Circuit Court of Baltimore City.

The opinion of the Court, together with the dissenting opinions, furnish a statement of the case.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ALVEY and ROBINSON, J.

*Bernard Carter* and *I. Nevett Steele,* for the appellant.

*Charles Marshall, Samuel H. Tagart* and *William F. Frick,* for the appellee.

ROBINSON, J., delivered the opinion of the Court.

This is a bill filed by the appellee against his wife, the appellant, for a divorce *a vinculo,* on the ground of adultery; and this appeal comes to us from a decree of the Court below, by which the marriage was dissolved, the custody of the children awarded to the complainant, and a certain deed of separation vacated.

The parties to this controversy were married in Baltimore City, in the year 1862; and the issue of that marriage was a son and two daughters, all of whom are now living.

In the summer of 1871, the complainant took his wife and children to Europe and returning to this country in April following, he left them in Bremen, his native place, with his family.

The bill charges adulterous intercourse between the appellant, and a certain Baron Von Brunneck, in Switzerland, in the month of August, 1873. And the first

question is, whether this charge is sustained by the testimony ?

The burden of proof is upon the complainant, and the evidence must establish affirmatively that *actual adultery* was committed, since nothing less than the *carnal act* itself can lay the foundation of a divorce for adultery.

Direct proof, that is, the evidence of eye-witnesses, is not required, for such is the nature of the offence and the secret and clandestine manner in which it is committed, that proof of this kind is in most cases unattainable; yet where it is sought to be *inferred* from circumstances, the latter must lead to the conclusion of guilt by fair inference, as a necessary conclusion. *Loveden vs. Loveden,* 4 *Eng. Ecc. Rep.,* 461.

As to what facts shall, and what shall not, constitute proof of adultery, no general rule can be laid down, because the same presumptions do not always follow the same facts, the weight of presumptions depending upon the character, habits and situation of the parties.

The only general rule to be laid down on the subject, says Lord STOWELL,

"Is that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion; for it is not to lead a harsh and intemperate judgment, moving upon appearances that are equally capable of two interpretations; neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man. The rational and legal inferences from such facts must be the same." *Loveden vs. Loveden,* 4 *Eng. Ecc. Rep.,* 462.

Artificial and technical rules, however, afford but little aid in determining questions of this kind, for after all, the question of guilt or innocence depends upon the facts and circumstances of each particular case.

Assuming then in this case, that the respondent is innocent of the offence charged against her, and recognizing

in their broadest sense, the liberal and humane principles by which evidence in cases of this kind is to be considered, and painfully sensible of the consequences necessarily resulting from the judgment about to be rendered, we are obliged to say, after a deliberate consideration of all the testimony in the record before us, that the charge of adultery against the respondent has been fully and conclusively established.

It would serve no good purpose to review in detail, the proof upon which this conclusion has been reached, and we shall content ourselves by saying that it is based upon facts and circumstances of the most conclusive character— upon the secret correspondence between the respondent and Von Brunneck, and her own declarations to her husband, when confronted with this correspondence, " that she loved Von Brunneck next to her God," "that she believed he had been sent into this world to make her happy," "and that she would not give him up."

It is impossible to reconcile the testimony before us with the innocence of the respondent, and we must therefore infer her guilt. 2 *Bishop on Marriage and Divorce*, 620.

Assuming then that the charge of adultery has been established, the question is whether any reasons exist why the complainant should not be entitled to a divorce ?

It is true a husband may forgive his wife, however flagrant may have been her guilt, and it is equally true that if he has forgiven her, such forgiveness will constitute a bar to a bill for divorce.

We do not understand it to be contended, that there has been any forgiveness or condonation in express terms on the part of the complainant; but the argument is, that the lapse of time between the discovery of his wife's guilt, and the filing of this bill, a period of three years and a half, taken in connection with the deed of separation of October, 1874, and the circumstances under which it was executed, amount in fact to a condonation of the

offence, and constitute therefore a bar to the relief now prayed.

No case has been referred to in which it has been held that the mere lapse of time will in itself operate as a bar to a divorce, on the ground of adultery ; and we apprehend none can be found, unless it be cases based upon statutory provisions. *Ferres vs. Ferres,* 1 *Hag. Con. Rep.,* 130 ; *D'Aquilar vs. D'Aquilar,* 1 *Hag. Eccl. Reps.,* 773, 3 *Eng. Ec. Reps.,* 329 ; *Cood vs. Cood,* 1 *Curteis Ec. Reps.,* 755, 6 *Eng. Ecl. Rep.,* 452.

Where a party has slumbered on his rights, and with full knowledge, has seemingly acquiesced in the wrong or injury done him, a Court of equity will lend an unwilling ear to his complaint. "The first thing" says Lord STOWELL, "the Court looks to when a charge of adultery is preferred, is the date of the charge relatively to the date of the criminal fact charged and known by the party, because if the interval be very long between the date and knowledge of the fact, and the exhibition of them to this Court, it will be indisposed to relieve a party who appears to have slumbered in sufficient comfort over them, and it will be inclined to infer either an insincerity in the complainant, or an acquiescence in the injury, whether real or supposed, or a condonation of it. It therefore demands a full and satisfactory explanation of this delay, in order to take it out of the reach of such interpretations."

Nor do we understand that it is contended, that a deed of separation will in itself constitute a bar. This question was argued by eminent counsel, and fully considered in *J. G. vs. H. G.,* 33 *Md.,* 401, and it was held that a voluntary deed of separation did not operate as a bar to a petition for divorce. And in support of this, the Court refers to a number of English decisions, and we have not been able to find a case in which a contrary doctrine has been held.

So we think it is quite clear that neither lapse of time nor mere articles of separation will, when separately con

sidered, operate as a bar ; and it is equally clear we think, that they cannot have this effect when combined, unless there be other circumstances to show that the application was not made *bona fide,* but for some sinister or collateral purpose. *Matthews vs. Matthews,* 1 *Swab. & Trist.,* 161.

But whatever presumptions may arise in this case from lapse of time, and whatever explanation may be required of the complainant, in regard to the causes of this delay, and the good faith in which his application is made, the proof in the record fully and satisfactorily shows the motives, feelings and convictions, by which he was governed in all he said and did from the moment he discovered his wife's infidelity, to the filing of the present bill.

To understand these, it will be necessary to refer briefly to some of the facts tending to explain the motives by which he was governed.

As we have seen, the complainant left his wife and children in Europe. In the summer of 1873 he went back to meet them, and to bring them home on his return. Immediately upon his arrival at Baden, he discovered the evidences of his wife's adulterous intercourse with Von Brunneck, and from that moment all conjugal relations between them ceased. So soon as the necessary arrangements could be made, he sailed with his wife and children for New York, having written before his departure to her father, Mr. Jenkins, to meet them upon their arrival. Mr. Jenkins did not however meet them, and the complainant came to Baltimore with his family, but instead of going to his own house, he took them to the Carrollton Hotel, where at his request they were met by Mr. Jenkins.

In the interview that followed, the complainant insisted : 1st. That his wife should go to her father's house and remain their six months under the observation of Mrs. Jenkins, who at the end of that time was to report to the complainant as to her deportment.

Kremelberg *vs.* Kremelberg.

2nd. That his son should live with him.

3rd. That the two girls should live with their grand-father in the same house with their mother, not under her care but under that of Mrs. Jenkins.

After some discussion these demands were reluctantly acceded to by Mr. Jenkins. This arrangement was made for the purpose of not only testing the character and deportment of his wife, but also his own feelings, and to ascertain whether it was possible to forgive her offence and take her back as his wife. It is obvious that the complainant was most anxious to avoid the scandal, shame and mortification to his children and himself, resulting from the exposure of his wife's infidelity.

At the end of the appointed time Mrs. Jenkins made a satisfactory report in regard to Mrs. Kremelberg's character and deportment, and thereupon her father made a formal application to the complainant in behalf of his daughter for a restitution of her conjugal rights. This being refused, a similar demand was made by Mr. Wallis as counsel for the wife. Then for the first time the complainant determined to disclose the reasons for his refusal, and placed the secret correspondence between his wife and Von Brunneck, in the hands of his counsel, Messrs. Brune and Tagart. This correspondence was submitted by them to Mr. Wallis, and thereupon the demand for the restitution of the conjugal rights of the respondent was abandoned, and negotiations ensued which resulted in the execution of the deed of separation.

By this deed it was agreed that the parties should live separate; that the complainant should have the custody of his son; that the eldest daughter should be sent at once to a boarding school to be selected by the mother; that the youngest daughter should remain with her mother, until she was seven years of age, and then to be sent to a boarding school, likewise to be selected by the mother; and that the complainant should pay to his

wife two thousand dollars annually for her support and maintenance, Mr. Jenkins agreeing to protect the complainant from all debts contracted by his daughter.

With the exception of a visit by the respondent to the house of her husband, for the purpose of inducing him to restore her again to the relations of a wife, the separation effected by this deed continued without interruption, until the youngest daughter reached the age of seven years.

A demand was then made by Mr. Kremelberg upon Mr. Jenkins, who was also a party to the deed of separation, that the little girl should be sent to school in accordance with the agreement. To this Mr. Jenkins replied by saying, that he had requested Mrs. Kremelberg to send the child to school, but that if she continued to refuse, he had no means of enforcing the obligation. He further says in the letter.

"I am advised by my counsel that I have no right to the custody of the child or to demand it of the mother under the agreement of separation. Mr. Kremelberg clearly has that right, and the only right of Mrs. Kremelberg is to say to what institution the child shall be sent when in his custody." Thereupon the counsel for complainant applied directly to Mrs. Kremelberg to carry out in this respect the provision of the articles of separation.

To this demand a letter was received from Mr. Carter, who in the meantime had been employed by the respondent as counsel, saying that the child had been under the treatment of a physician, but that Mrs. Kremelberg would place her at school immediately after the Easter holidays. In concluding the letter, Mr. Carter further says that Mrs. Kremelberg considers "according to the fair interpretation of said agreement of separation, she is entitled to the society and care of her two daughters during their vacations, and such times as they are not at school."

It can hardly be necessary to say that this construction of the articles of separation was a surprise to the complain-

Kremelberg *vs.* Kremelberg.

ant. As understood by him, and by Mr. Jenkins, the father of the respondent, who was also a party to the deed, and by her counsel Mr. Wallis, by whom the deed was prepared, Mr. Kremelberg was entitled to the custody of the daughters, and the only right of the wife under the deed was to select the school to which they should be sent.

It must be borne in mind, that we are now considering the motives by which the complainant was governed in his application for a divorce, and his understanding of the deed is of more importance than the strict legal construction of the paper itself, for the reason that it derives its chief importance in this connection from the light it is supposed to cast upon the feelings and intentions of the parties, rather than the rights derived under it.

The complainant was thus confronted by the claim of his wife under the deed to the exercise of a larger authority and control over the daughters than she "could have asserted without the contract, for if she was entitled to their custody when not at school, and she proposed to exercise this right living apart from her husband, it was equivalent to the exclusive custody of the daughters while not at school."

If such was the legal effect of the deed, the complainant saw at once how utterly it had failed to accomplish what he intended, and that instead of narrowing the control of the mother over the daughters, it had restricted the exercise of the rights and authority over them to which he was entitled as a father. Now the obvious motives by which he was governed in all he did, was to prevent the shame and disgrace to his children and himself, that would result from the exposure of his wife's infidelity, and to preserve to himself the care and custody of his children so far as this could be done consistently with their ages and condition.

What then was he to do? Either to submit to the construction thus placed upon the deed and surrender them

to the custody of his wife, or to take some steps, by which his rights as a father might in this respect be asserted.

The object of the deed as it recites was "*to avoid painful litigation, and for the happiness and interest of their children and of all concerned.*"

In view, however, of the construction thus placed upon it by the wife, the deed had failed to answer the purposes for which it was intended, the "painful litigation" was no longer to be avoided, for any proceeding instituted by him in regard to the custody of his daughters would necessarily involve the causes and circumstances under which the deed was executed, and the exposure of his wife's adultery, "which for the happiness and interest of his children and of all concerned" he had been so anxious to prevent. An application for a divorce then based upon the guilt of his wife, and the rights resulting to him therefrom, became a natural and necessary proceeding.

This brief review of the testimony fully explains the objects and purposes of the Carrollton arrangement—of the deed of separation—the reasons why the complainant did not file a bill for divorce, upon the discovery of his wife's guilt, and the causes which finally made such a bill a necessary and proper proceeding. Instead of bad faith, it shows that throughout the trying and painful situation in which he was placed, he exhibited in all he said and did, a discretion, forbearance and unselfish consideration for the rights and feelings of others, not often to be found in cases of this kind. Instead of forgiving, or condoning his wife's infidelity, it shows that from the time he first discovered it, all conjugal relations between them ceased, and however anxious to avoid its publicity, against her entreaties and the entreaties of others, he refused to recognize her again as his wife. Under such circumstances, we are of opinion that neither the delay in making the present application, nor the execution of the deed of separation, nor the circumstances under which it

Kremelberg *vs.* Kremelberg.

was made, whether considered separately or together, constitute any bar to the divorce now prayed.

We come now to the question, and the only question in regard to which we have had any difficulty, and that is, what is the legal effect and operation of the divorce upon the deed of separation?

It is hardly necessary to say, that both Courts of law and equity have uniformly refused to recognize the validity of voluntary deeds of separation, so far as they undertake to release the parties from the duties and obligations resulting from the marriage contract. This the parties have no power to do.

It can only be done in the mode and in the manner prescribed by law, and for causes recognized by law. Any private understanding or agreeement, says Sir JOHN NICHOLL, between husband and wife to live separate, is not recognized by law. *Smith vs. Smith,* 4 *Hagg. Ecc. Rep.,* 514, 609.

But although the deed may be void in this respect, it is well settled that a covenant in such deeds for the support of the wife, if made with trustees in her behalf, and in consideration of indemnity against future debts contracted by her, will be enforced. *Elworthy vs. Bird,* 2 *Sim. & St.,* 372; *Seeling vs. Crawley,* 2 *Vern.,* 386; *Stevens vs. Olive,* 2 *B. C. C.,* 90; *Seagrave vs. Seagrave,* 13 *Ves.,* 439.

The question then in this case is, what is the effect of a divorce for the wife's adultery, which was known to the husband at the time of the execution of the deed upon such a covenant?

It cannot be unlawful for a husband to provide by deed for the support of an erring wife, and if he should subsequently obtain a divorce for adultery, of which he was aware at the time he made the covenant, and the wife has done nothing to forfeit her rights under the covenant, we see no good reason why the divorce should discharge the husband from the obligation he has thus voluntarily assumed.

Now in this case the complainant with full knowledge of his wife's adultery, voluntarily covenanted with her father, to pay to her two thousand dollars annually during his life. It was undoubtedly a very liberal provision, and more than she had any right to expect. But it was an agreement voluntarily and deliberately made by the complainant. There is no proof, nor is there any intimation that the wife has been guilty of a repetition of the offence which has been the source of all this trouble. And although the deed of separation does not operate as a bar to the application for divorce, we see no inconsistency in granting a divorce, and at the same time refuse to release the husband from a covenant providing for the support of his wife.

The deed does not provide for the payment of the annuity so long as the respondent should remain as his wife, nor that it is to be discharged upon a divorce of the parties. The fact is, at the time the covenant was made, the parties only contemplated living apart, and did not therefore make any provision upon the contingency of a divorce.

The case of *Charlesworth and another vs. Holt,* 29 *Law Reporter,* (*N. S.*) (*Law Times Reports,*) 647, goes much further than this. There the deed of separation after reciting that unhappy differences had arisen between the parties, in consequence whereof, they had agreed to live separate, further provided, that the husband should pay a certain annuity to his wife during their joint lives.

Upon a suit brought upon this deed, the husband pleaded, that after its execution, the plaintiff, his wife, had committed adultery with one Samuel Oxley, and that in consequence thereof, he had obtained a divorce dissolving absolutely the marriage. This plea was held, on demurrer, by KELLY, C. B., BRAMWELL and PIGOTT, B., to be a bad plea.

Kremelberg *vs.* Kremelberg.

KELLY, C. B., said :

" I am of opinion that the judgment of the Court in this case should be given to the plaintiff. It appears to me that all the authorities are one way." And in reply to the argument of Mr. HOLKER, Q. C., that it would be inexpedient, unreasonable and unjust, that a woman, who by reason of her own wilful and unjustifiable act of adultery has been divorced, should nevertheless continue to receive an annuity from, and to be supported by, the person, who had previously to the divorce, stood towards her in the relation of husband, the Judge said :

" That may be so, as a matter of reasoning, but the answer to it as an argument for our doing what we are here called upon to do, is shortly and simply this, that the Court has no power to introduce any such condition into this deed, however proper and reasonable in a moral and social point of view it might be to do so."

PIGOTT, B. " The contingency of adultery being committed by either of the parties, was evidently not contemplated by any one when the deed was executed, and therefore the Court cannot introduce into the deed a condition not already there."

We have quoted somewhat at length from this case, to show that it goes much further than is necessary in the case before us. Without being understood as adopting all that was said by the Judges, we have referred to it for the purpose of showing that so late as 1874, it was held in England, that a divorce for the wife's adultery did not discharge the husband from liability, on a covenant in a deed of separation, providing for the payment of an annuity to his wife.

In regard to the care and custody of the children, no good reason has been shown why the Court should interfere with the natural rights of the father in this respect.

It follows from what we have said, that so much of the decree below as dissolves the marriage of the complainant

and respondent, and grants a divorce *a vinculo matrimonii* to the complainant, and awards the care and custody of the children to the complainant, will be affirmed; but that so much of the decree as sets aside the deed of separation in respect to the payment of the sum therein provided to the respondent, will be reversed.

> *Decree affirmed in part, and*
> *reversed in part, and*
> *cause remanded.*

(Decided 17th July, 1879.)

BOWIE, J., filed the following dissenting opinion:

The decree from which this appeal is taken annulled the marriage of the complainant and defendant, and divorced the former from the latter, " *a vinculo matrimonii.*" It ordered and decreed that the children of the parties divorced, be committed to the care and custody of the complainant, their father, until they shall respectively attain their legal majority; and further adjudged and decreed, that the deed or articles of separation mentioned in the proceedings, dated the 31st day of October, 1874, between the complainant, John D. Kremelberg, of the one part, and the respondent and Joseph W. Jenkins of the other part, be vacated and annulled. This decree implies and involves the exercise of the several and respective powers, both of Courts of Divorce and Courts of Chancery.

Matrimonial causes belonged originally to Ecclesiastical Courts, by which the power of divorce was exclusively exercised. The temporal Courts, had the sole cognizance of examining and deciding directly upon all the temporal rights of property. *Shelford on Mar. & Divorce, ch.* 6, *p.* 459, *Eng. Edition, London,* 1841. Ecclesiastical Courts rarely recognized the existence or validity of deeds of separation, and never exercised the power of vacating them. On the other hand, it is the peculiar province of Courts of

Kremelberg *vs.* Kremelberg.

Chancery to enforce or set them aside. But Ecclesiastical Courts, in determining the right of either party to divorce, incidentally considered the execution of a deed of separation as an important fact in the case of the complainant. Prior to the adoption of the Constitution of 1851, the granting of divorces was a regular exercise of legislative power, notwithstanding the authority vested in the Courts of equity to divorce *a mensa et thoro* and *a vinculo*; but by the provisions of that instrument, and all succeeding Constitutions of this State, the General Assembly is prohibited from passing special Acts of divorce, thus indicating that the rights created by the sacred and solemn contract of marriage shall not be dissolved by arbitrary legislative will, however wisely directed; but only according to the principles of Courts of justice, long established, previously ascertained and judicially administered.

It was said by this Court in *J. G. vs. H. G.,* 33 *Md.,* 406, that a Court of equity in this State, on applications for divorce " sits, not in the exercise of its general and ordinary equitable jurisdiction, but as a Divorce Court; and must be governed by the rules and principles established in the Ecclesiastical Courts in England, wherein a similar jurisdiction has been exercised, so far as they are consistent with the provisions of the Code."

Until the year 1858, the Ecclesiastical Courts of England possessed no power to divorce "*a vinculo*" for adultery, but could only grant divorces "*a mensa et thoro;*" hence, for the law of divorce "*a vinculo,*" we must look to the law of Parliment, which to a certain extent may be regarded as the highest Court in England in matrimonial causes, whether they exercise their power in a legislative or judicial capacity.

In the comparatively brief period which has elapsed since the Courts of equity of this State, have acquired jurisdiction in cases of divorce "*a vinculo,*" few cases, if any, have occurred, distinguishing the exercise of the

power of total divorce, from that of partial divorce, or establishing rules which would govern in the one, and do not in the other. The effect of the decree in the one case, being widely different and more extensive than in the other, Courts would be greatly misled, if they indiscriminately adopted rules designed in cases for partial divorce, as applicable to cases for a total divorce.

Upon the question of the effect of the deed of separation upon the right to a divorce, this Court declared in the case before cited from the reference to the precedents in the English Ecclesiastical Courts, "it appears to have been long settled, that a voluntary deed of separation between husband and wife, is not ' *per se* ' a bar to a suit in the Ecclesiastical Court for a restitution of marital rights, or to a petition for divorce," citing *Durant vs. Durant*, 1 *Hagg.* 733, (3 *Eng. Eccl. Rept.*, 310;) *Beeby vs. Beeby*, 1 *Hagg.* 789, (3 *Eng. Ecc. Rept.*, 338;) *Westmeath vs. Westmeath*, 2 *Hagg. Supp.*, 1, (4 *Eng. Eccl. Rept.*, 238;) *Spering vs. Spering*, 3 *Swab. & Trist.*, 211; *Hunt vs. Hunt*, 32 *L. J.*, 168.

"Some cases (the Court continues) have arisen upon applications for divorce in the Ecclesiactical Courts, in which a voluntary deed of separation between the parties, has been considered in connection with lapse of time, and other circumstances as sufficient to show the application was not made *bona fide* for the cause assigned; but for some sinister or collateral purpose, and the application for that reason, has been denied." Such were the cases of *Matthews vs. Matthews*, 1 *Swab. & Trist.*, 499, and *Williams vs. Williams*, 35 *Law Journal*, 85.

In *Matthews vs. Matthews*, the deed of separation, was executed in 1853, between George Matthews of the one part, and Stephen Clark, brother of Ann Matthews the wife of the other, reciting that differences had arisen between Matthews and his wife, and they were mutually desirous to live separate ; that it had been agreed between

Matthews, and Clark as the brother, and on behalf of Ann Matthews, that Clark should indemnify Matthews, against all liability for the debts of his wife, and that Matthews, in consideration of such undertaking, etc., would permit his wife to live apart as if she were *féme sole,* and have entire custody and control over her children. The wife petitioned in 1856 for a divorce on the ground of cruelty, committed by her husband prior to the deed. It was held, that although the lapse of time was not an absolute bar, yet taken in connection with the deed of separation, it showed, that it was not a *bona fide* application made for the protection of the wife, but for some collateral purpose, and that the Court ought not to grant the prayer of the petition. This case is strongly analagous to that now before us. The distinguishing features are, that the application for divorce proceeded from the wife, and not the husband, and the ground of complaint, was cruelty, not adultery.

From these authorities, which might be indefinitely multiplied to the same effect, it would appear, that however well grounded the charge, if the complainant sleeps upon his rights, or, knowing his wrongs, enters into agreements and obligations, inconsistent with the presumption of their actual existence, or treats with others, upon the implication of their non-existence, he thereby waives his right to the remedies which the law otherwise extends to him. And although deeds of separation, are not *per se,* a plea in bar to an application for a divorce, according to these authorities, yet, united with the lapse of time, unexplained and unaccounted for, they constitute sufficient ground to justify the Court in refusing the extreme remedy.

In applications for divorce, the question for the consideration of the Courts, is not solely the guilt or innocence of the accused, but whether the complainant has so demeaned himself or herself, as to be entitled to the intervention of the Court.

Although the guilt of the accused must be satisfactorily established, to entitle the complainant to a divorce, it does not necessarily follow in any particular case, that the Court should decide that question in determining whether the complainant is entitled to relief. The controlling preliminary inquiry, is the conduct of the complainant after his supposed wrongs, involving it may be his belief in the truth of the charge, and concluding his rights in the premises, according to the covenants and agreements he may have entered into, and the vigilance he has shown in asserting them.

The bond of marriage cannot be dissolved without involving both the innocent and guilty, in opprobrium and disgrace. The children of the marriage (if any) must incur more or less of the stigma which attaches to the delinquent parent. Humanity, justice and sound policy dictate, that all deeds, and covenants, devised and executed for the purpose of preserving domestic peace and private character from reproach, protecting the innocent issue from the dishonor of defiled nuptials, and securing the sacred bond of society from judicial dissolution, should be favored and enforced.

As we have said the Ecclesiastical Courts of England, possessed no power to divorce "a vinculo," for adultery, until the year 1858; prior to which adultery was a cause of divorce "a mensa et thoro," and deeds of separation, were not per se, a bar to such divorces. But, in the House of Lords, articles of separation were held to form an insuperable bar to the special interposition of the Legislature, on an application for a divorce. Shelford on Mar. & Div., 383; 33 Hans. Par. Deb., 1306, 1308, in Esteny Divorce, 1798. In this case, the articles were made in ignorance of the wife's gross misconduct, and before it had occurred, yet the Lord Chancellor said the articles formed an insuperable bar to any divorce, and the circumstances of collusion which appeared in the case rendered it the duty of

the House to reject the application. *Ibid.* What the circumstances of collusion in that case were, which induced the Chancellor to advise the rejection of the application, is not reported; but it is obvious they were independent of the articles which are spoken of as a distinct ground of objection. These being made before the misconduct of the wife, and in ignorance of it, must have operated *per se,* according to some rule of policy, which Parliament had adopted and prescribed. " The husband was held to be deprived of his right to a divorce in Parliament, by a letter offering £200 a year for the separate maintenance of his wife, and agreeing to articles of separation, and to give up the adulterous connexion." *Pang's Divorce, House of Lords,* 28 *Mar.,* 1838; *Shelford on Mar. & Divorce,* 383.

The great end and motive for the execution of articles of separation between husband and wife is, to avoid litigation, suppress scandal, provide for the maintenance of the wife, the support and education of the children (if any) and to exonerate the husband from future liabilities. To compose domestic strife, by private compact and treaty of peace, rather than resort to the arbitrament of Courts.

The maintenance of the wife is a substitute for alimony, which is always granted her when she is divorced upon her application, and which is always forfeited when she is divorced " *causa adulterii.* "

A deed, reciting that husband and wife have had unhappy differences and " have been separated, and living separate and apart for nearly a year past, and still are, and in order to avoid painful litigation, and for the happiness and interest of their children, and of all concerned have agreed as a settlement of all differences and causes of differences between them, to continue to live separate and apart henceforth, on the terms set forth therein," is a solemn and perpetual covenant, not to be annulled, except in extreme cases. It is an express admission that the wife is, as wife, or by virtue of covenants and considerations

therein contained, on her part, or in her behalf, entitled to the provision therein made for her, and to enjoy it in peace and quietness, without reproach or litigation. It is a pledge, that for the happiness and interest of their children, all differences and causes of difference should be buried in oblivion.

In weighing the claims of the husband, to the remedy of divorce "*a vinculo*," which depends as much upon the conduct of the accuser, as that of the accused, such a deed must be considered as a most controlling circumstance, whether we regard it as an implied admission that the wife is innocent of the most odious offence she can commit against her husband; or as a covenant for valuable considerations, to waive all such imputations, and secure her peace and quietness, with an adequate allowance during her husband's life. Standing alone, without connection with prior or subsequent relations between the principal parties, the provisions of the deed are irreconcileable with the theory, that the grantor then believed himself the victim of conjugal infidelity. Taken in connection with the declarations and conduct of the complainant, prior and subsequent to the execution of the deed of separation, such a conclusion is incredible.

At the interview between the complainant and his father-in-law, and brother-in-law, immediately upon his return from Europe, in a family council in which his domestic grievances were first exposed to them personally; to the direct questions of both of these gentlemen, whether he meant to impute to his wife, dishonor or criminal conduct, he emphatically declared he did not. The probation of six months, under the surveillance of her stepmother, to which he subjected his wife, in order that he might in that time in the language of the bill of complaint, "*test his feelings towards her*," with the understanding, (according to the testimony of his sister-in-law) if her temper and general behaviour were good, that he would take her

back as his wife; the lapse of fourteen months between the date of the alleged causes of divorce and the execution of the deed of separation with full knowledge of all that had transpired; the deliberate execution of the deed, containing provisions which virtually repudiated the main ground of accusation; acquiescence for two years and a half afterwards, in the terms of separation, and payment of the allowance stipulated, combined, constitute such an " estoppel in pais," as cannot be evaded or overcome.

On the other hand, regarded as a private treaty between the parties, made for a valid and good consideration, to protect innocence and infancy, suppress scandal, avoid litigation and preserve domestic peace, we can perceive no reason why it should be annulled and vacated. The weight of authority, in our opinion, decidedly forbids it.

" In Blount vs Winter and Winter vs. Blount, July 19th, 1781, the original bill was filed by trustees in marriage articles and the children of the marriage, against the husband and wife, and the cross-bill was filed by the husband against the wife and children—the original bill prayed a performance of the articles, and the husband by his answer to the original bill and by the cross-bill resisted the performance so far as the articles made provision for the wife, alleging and proving in the cross cause, that she lived separate from him in adultery. The Court was of opinion that this was not a reason for non-performance of the articles as to the wife, and made a decree accordingly in the original cause, and dismissed the cross-bill without costs." Reg. Div. A, 1780, fol. 550; 3 Peere Williams, 276, note 2.

In the cases of Wright vs. Miller, in the Court of Chancery of New York, which were cross-bills to set aside certain conveyances of real estate, and two decrees affecting the same, the question of the effect of a divorce upon an annuity previously settled on the wife, was incidentally involved. The Chancellor said, " It was suggested by

Mrs. Miller's counsel that she received the annuity by sufferance merely, and that it was cut off by divorce. I apprehend that the divorce did. not affect it at all." (See *Sidney vs. Sidney*, 3 *P. Wms.*, 269 ; *Blount vs. Winter, Id.*, 276, *note by Cox; Field vs. Serres*, 1 *Bos. & Pul.*, New *Rep.*, 121; *Shelford on Mar. & Divorce*, 421–2; *Roper's Husband & Wife, by Jacob*, 134, 137,) 1 *Sanford's Chy. Rep.*, 126. The case of *Jee vs. Thurlow*, 2 *Barn. & Cress.*, 547, is to the same effect. "By a deed of three parts, between husband and wife, and trustee, reciting that differences existed, and that the husband and wife had agreed to live separate, the husband covenanted to pay an annuity to the wife during so much of her life as he should live, and the trustee covenanted to indemnify the husband against the wife's debts, and that she should release all claim of jointure, dower and thirds. It was held that this deed was legal and binding, and that a plea by the husband, that the wife sued in the Ecclesiastical Courts for restitution of conjugal rights, and that he put in an allegation and exhibits charging her with adultery, and that a decree of divorce ' *a mensa et thoro* ' was in that cause pronounced, was not a sufficient answer to an action by the trustee for arrears of the annuity." The principal contention in this case was, whether the policy of the law would sanction a provision for future separation, but all the Judges, ABBOTT, C. J., BAYLEY, HOLROYD, and BEST, J. concurred that where separation had already occurred, and the husband had entered into covenants for the future, in consideration of covenants "*in ease of the husband*" the husband was bound unqualifiedly. BEST, J., said, "Whatever opinions Judges may have entertained as to the policy or impolicy of such contracts as this, it would be a strong measure for us, on the mere ground of policy, to overthrow former decisions, when Lord ELDON, sitting in the House of Lords, did not feel himself strong enough to do so."

Kremelberg *vs.* Kremelberg.

In a very recent case in the Court of Exchequer, before KELLY, C. B., and BRAMWELL and PIGOTT, B. B., in an action upon a bond or deed whereby the defendant covenanted to pay trustees for the wife, during the joint lives of the husband and wife, and so long as they shall live separate and apart; it was held that the fact of the wife's subsequent adultery and her divorce, and the consequent dissolution of the marriage by a decree, etc., are no answer to an action by the trustees for the arrears of the annuity. KELLY, C. B., said : "I am of opinion that the judgment of the Court in this case should be given for the plaintiff. It appears to me, all the authorities are one way. There is not a shadow of authority in favor of the proposition which Mr. Holker, on the part of the defendant, has contended for before us, that any Court of law can introduce words into a deed, so as to alter the express terms of the covenant contained therein." 29 *Law Times, N. S.*, 649.

Regarding this case from the standpoint in which the husband viewed it, when he executed the articles of separation, for high moral and valuable considerations, we can find no sufficient cause to authorize a Court of divorce to dissolve the marriage tie, or a Court of equity to vacate the solemn compact for the preservation of the interests and happiness of all concerned, and the maintenance of the mother, and education of their children. In the language of Chancellor JOHNSON, in the case of *Brown vs. Brown*, 5 *Gill*, 255, affirmed by this Court, having selected their own remedy by the execution of this deed, after an actual separation for years, no sufficient reason has been assigned, why this Court should be called upon absolutely to dissolve the marriage.

"It is not alleged or proved, that any circumstances have transpired since the execution of the deed which render it necessary or proper that the relations of the parties as established by that instrument, should be changed, and the Court would be most reluctant to do so, especially in

the manner and to the extent proposed by this bill, unless a case of strong urgency was made out, as the effect of such a change upon the rights secured by the deed, might occasion embarrassing, if not injurious consequences."

ALVEY, J., filed the following dissenting opinion:

I dissent from the opinion of the majority of the Court in this case, and agree with Judge BOWIE, that the decree of the Court below should be reversed, and the bill dismissed.

Whether the wife be guilty of the offence charged against her by her husband, is a question in regard to which I give no opinion; nor do I think it necessary to declare the innocence of the wife, in order to conclude that the husband has no proper standing in Court.

The offence of which the wife is charged, if she be guilty, was committed in the summer of 1873; all the evidences of that offence, upon which the charge is made, became fully known to the husband in the latter part of the summer of that year; and he and his wife returned from Europe to Baltimore in the fall following. Upon their return to Baltimore they at once separated, and lived apart. This was at the instance of the husband, and, according to the evidence, one of the objects of separation was, that the husband might have time within which to test his feelings, with the view of possible reconciliation. After the lapse of nearly a year, the deed of separation of the 31st of October, 1874, was executed by the parties. That deed was made with full knowledge of all the circumstances of the case, and after the lapse of sufficient time not only for fully testing the feelings but for the most deliberate consideration, it was made, moreover, under the advice and direction of very prudent and discreet counsel, after weighing and considering all the facts of the case, and determining what was best and most

Kremelberg *vs.* Kremelberg.

judicious for all the parties concerned, the children as well as the parents. The motives and reason for making the deed are fully and clearly set forth on the face of the deed itself; and there is no reasonable ground whatever shown for breaking up this family settlement of their unhappy differences. The deed recites " that whereas the said John D. Kremelberg and Gertrude J. Kremelberg, his wife, have had unhappy differences, and have been separated and living separate and apart for nearly a year past, and still are, and in order *to avoid painful litigation,* and for the happiness and interest of their children and of all concerned, *have agreed as a settlement of all differences and causes of differences between them,* to continue to live separate and apart henceforth, on the terms set forth in this deed of separation." Under this deed, the parties continued to live separate until the 29th of March, 1877, when the present bill was filed;—a period of nearly two years and a half from the time of making the deed, and nearly three years and a half from the time of their return from Europe, and after all the evidence upon which the present application is founded had become fully known to the husband. It is not alleged, nor is it pretended to be shown in proof, that there has been any subsequent disclosure affecting the chastity of the wife; nor is it pretended that there was any difficulty or obstacle whatever in the way of producing all the proof now relied on immediately after their return from Europe. It is abundantly shown, by the proof produced by the husband himself, that the character of the wife for chastity and virtuous deportment, both before and since the summer of 1873, was and has been most exemplary, and above all reproach. Why then, after all this delay, and after the settlement of all differences by the execution of the deed of separation, with full knowledge of all the facts of the case on the part of the husband, should this application be made for the dissolution of the marriage, and the vaca-

tion of the deed of separation? I must confess that I am at a loss to understand upon what principle, consistently with authority and established doctrine upon the subject, the present application can be favorably entertained.

While it may be conceded that the husband is not, ordinarily, barred of his right to divorce by reason simply of his having executed a deed of separation and settlement after knowledge of his wife's adultery, yet the fact of such deed does afford a strong ground of opposition; and when coupled with other facts, such as great delay, without sufficient explanation, the bar is rendered complete.

The effect of delay alone is very strong against the application, if not accounted for, by alleging and showing such circumstances as will justify the delay in making the complaint. This is clearly stated by Sir WILLIAM SCOTT, a high authority upon this subject, in his judgment in the case of *Mortimer vs. Mortimer,* 2 *Hagg., Const. Rep.,* 310. That great Judge, acting upon the allegation of a husband charging his wife with adultery, said: "The first thing which the Court looks to, when a charge of adultery is preferred, is the date of the charge, relatively to the date of the criminal fact charged, and known by the party; because, if the interval be very long between the date and knowledge of the fact, and the exhibition of them to this Court, it will be indisposed to relieve a party, who appears to have slumbered in sufficient comfort over them; and it will be inclined to infer either an insincerity in the complaint, or an acquiescence in the injury, whether real or supposed, or a condonation of it. It, therefore, demands a full and satisfactory explanation of this delay, in order to take it out of the reach of such interpretation." So, again, in the case of *Cood vs. Cood,* 1 *Curteis,* 755, upon an application of a husband to be divorced from his wife upon the ground of adultery alleged to have been committed by the latter, Dr. LUSHINGTON, in the course of his

judgment, said: "The principle of this Court, and of all Courts, is, that the husband ought to proceed with such celerity as the case admits of, to obtain the remedy he seeks; but I conceive it is also settled, that if any circumstances occur, which reasonably prevent him from proceeding, he is not thereby debarred from doing so at a time more convenient to him." We have seen what delay occurred in this case before making the application; and the fact of the execution of the deed, when considered in connection with this great delay, without a pretence of any subsequent discovery of facts reflecting upon the question of guilt of the wife, and nothing alleged or proved to show any greater reason or necessity for filing the bill at the time it was filed than existed at the date of the deed, constitutes, in my judgment, a complete bar to relief. In the case of *Brown vs. Brown,* 5 *Gill,* 249, where husband and wife had actually separated, the wife having deserted and persistently refused to cohabit with her husband for a period of ten years, and afterwards they selected their own remedy by the execution of a deed of separation, and continued to live separate, without any new circumstances transpiring to produce a change in their relations subsequent to the date of the deed, upon the application of the husband, the Court refused to grant a decree *a vinculo matrimonii,* upon the distinct ground that the parties had settled their differences, and that the Court was averse to disturbing in any manner the deed of separation. That was a case, it is true, of abandonment by the wife; but abandonment, equally with adultery, constitutes cause of divorce *a vinculo matrimonii,* under the statute; and the application for the one cause equally as for the other is founded upon the wilful misconduct of the party complained against. The decision just referred to was made by an able Chancellor, the late Chancellor JOHNSON, and upon appeal, his judgment was affirmed by our predecessors in this Court, for the reasons assigned by the

Chancellor for his decree.   The  decision  in that case  has stood as the settled law of this State  for  the  last  thirty years ;  and,  as  a  precedent, I  think  it  is  of  great force against the present application.

The facts alleged as an excuse or justification for filing the bill, and seeking to break up and get rid of the family settlement of all  differences and causes of differences be-tween  husband  and  wife,  are,  in  my  judgment,  utterly futile.   The fact that the wife went to the husband's house after the making  the deed, when  viewed  in. the  light of attending  circumstances,  amounts  to  literally  nothing. She went by the advice of a friend to seek reconciliation with  her  husband,  and  she  only  remained  one  night. Every  circumstance,  however,  attending  her  short  stay, has been greatly colored and  magnified, in order to give importance to the fact of the visit.   But, if any signifi-cance whatever could be justly attached to the fact, it was fully condoned by the husband, when  he paid up the sub-sequent arrears of the annuity under the deed of settle-ment.    And, as to  the allegation that the wife neglected or refused to send one  of  the  little  children  to school, in violation  of her  duty  under the·deed,  it  is  abundantly shown that the child was not in a condition to be sent to school ; that it was in feeble health, and that the physician attending it had advised against sending it to school until improved in health.   And as to  the construction of the deed with respect to  the control of the two  female chil-dren, that was a  question that could have been easily settled; the  mother  and  her  counsel  were  certainly at liberty to insist upon what they supposed to be a fair con-struction  of  the  deed,  without  incurring  the  hazard of breaking up the entire settlement.

The application was made  to the Court below for the exercise of a double jurisdiction.   First, that of a divorce Court ;  and  second, that of an ordinary  Court of equity. Hence  the  prayer for a  divorce *a vinculo matrimonii*, and

also for the vacation of the deed of separation and settlement.

In the exercise of the jurisdiction over the subject of divorce, the Court below granted the divorce as prayed by the husband, and a majority of this Court have affirmed the decree in that respect; but that part of the decree of the Court below that was passed in the exercise of its ordinary equity jurisdiction, vacating entirely the deed of separation, has been reversed, so far as the same relates to the annuity agreed to be paid to the wife. In this latter part of the decree of this Court I entirely agree, though I am of opinion that the decree appealed from should have been reversed *in toto*. It is very clear, I think, both from decisions in the Courts of common law and those in the Courts of equity, that a deed of separation, so far as its property provisions are concerned, if valid when executed, does not become invalid by reason of the subsequent dissolution of the marriage for adultery committed by the wife before the deed was made. This subject was fully considered in the case of *Evans vs. Carrington*, 2 *D. F. & J.*, 481. And if the deed does not fall as the legal consequence of the dissolution of the marriage, there is clearly nothing in this case that could induce the Court, as there was in the case of *Evans vs. Carrington*, to declare the deed void.

There is another subject upon which I must add a few words, and that is, the omission in the decree of this Court to make any provision in regard to the children, or the right of access to them. By the deed of separation, it was distinctly agreed between the husband and wife, that reasonable access to and enjoyment of the society of their children should continue and be allowed to the parties respectively. This provision in the deed has been stricken down as a covenant between the parties, and the decree of this Court contains no provision upon the subject; and consequently, the mother may be entirely excluded from all access to

her children.    For this I can perceive neither reason nor justice, to say nothing of the natural claims of the mother. In the recent case of *Hill vs. Hill,* 49 *Md.,* 450, this Court ordered the revival of a provision in a decree of divorce, which secured to the mother, upon whose adultery the divorce was granted, a restricted access to her child ; and if upon the circumstances of that case it was proper, as it doubtless was, to secure to the mother access to her child, I think liberal access to her children ought to be secured to the mother in this case.