[Nos. 30363, 30364. Department Two. April 1, 1948.]

JOHN D. L. FITZGERALD, *Appellant*, v. JOHN H. LEUTHOLD, *Respondent*.

*In the Matter of the Guardianship of* JOHN L. FITZGERALD, *a Minor*.

W. M. LEUTHOLD *et al.*, *Respondents*, v. JOHN D. L. FITZGERALD, *Appellant*.[1]

[1]Reported in 192 P. (2d) 371.

*J. K. Cheadle* and *Moulton & Powell,* for appellant.

*Graves, Kizer & Graves,* for respondents.

JEFFERS, J.—We have before us for consideration two actions, a *habeas corpus* proceeding and a guardianship proceeding. The *habeas corpus* action was instituted by John D. L. Fitzgerald against John H. Leuthold, in the superior court for Spokane county, on February 28, 1947, for the purpose, as stated in his petition, of obtaining the custody of his three-year-old son, John L. Fitzgerald.

The guardianship proceeding was instituted by the filing of a petition by W. M. Leuthold, Grace H. Leuthold, and John H. Leuthold, in the superior court for Spokane county, on February 19, 1947, asking that John H. Leuthold be appointed guardian of the person and estate of John L. Fitzgerald, a minor. It is alleged in the petition that John L. Fitzgerald is a minor of approximately three years of age, having been born May 1, 1944; that he has property in the state of Washington needing care and attention. It is further alleged that the minor is the grandson of petitioners W. M. and Grace H. Leuthold, and the nephew of petitioner John H. Leuthold; that the father of the minor is John D. L. Fitzgerald, who is a citizen of the Dominion of Canada, residing at Toronto, Ontario.

Before referring to and discussing the proceedings which followed the initiation of the two actions above mentioned, we think it would be well to give some of the background

of the parties who will be hereinafter mentioned as the active participants in those actions, and some of the events which lead up to the two actions, setting out further facts as the opinion proceeds.

W. M. (or Walter) Leuthold was born in southern Minnesota. He graduated from high school, went to the Univercity of Minnesota for two years, to Cornell for one year, and then back to Minnesota, where he graduated in 1909. Walter came west in 1910, and in June, 1912, was married to Grace Heitman, which marriage has continued through the years. In 1914, Walter, together with a Mr. Wilson, with whom he had been associated in the lumber business at Fish Lake, Idaho, organized the Deer Park Lumber Company, and took over certain properties at Deer Park, Washington. Walter and Grace Leuthold, since that time, except for a few winters spent in Spokane, have lived at Deer Park, which is about twenty-four miles north of Spokane. Two children were born to Mr. and Mrs. Leuthold—John H. Leuthold in 1913, and Caroline in 1918.

Throughout the statement of facts, Mr. and Mrs. W. M. Leuthold are referred to as Walter and Grace, and John H. Leuthold is referred to as Sam. We shall hereinafter refer to them in most instances by those names.

Sometime about 1926, Grace Leuthold gave to her daughter Caroline forty thousand shares of preferred stock in the Deer Park Lumber Company, and Walter gave the same number of shares to his son Sam. This stock was the foundation of the estates of both Sam and Caroline and was carefully guarded by Walter during the minority of his children.

Caroline went to grade school in Spokane, spent four years in a boarding school at Bryn Mawr, Pennsylvania, and eventually graduated from Smith College.

Sam went to grade school in Deer Park and Spokane, and, after a year in high school, he was sent to a military school in Wisconsin. Sam returned to Washington and, after following various occupations, was employed by his father in the business at Deer Park. Sam was married in

1939, and his wife will hereinafter be referred to as Betty Leuthold. Sam and Betty have never had any children.

In 1939, the Leutholds bought the Wilson interest in the Deer Park Lumber Company, and in 1941, the corporation was converted into a partnership, the members of which were Walter, Grace, Sam, and Caroline Leuthold. Walter and Grace owned a sixty per cent interest in the partnership, and Sam and Caroline each twenty per cent.

The partnership carried on a manufacturing business until about July 1, 1946, when an operating company known as the Deer Park Pine Industries was organized, and this corporation has since carried on the operations formerly conducted by the Deer Park Lumber Company. The corporation leases the plant of the partnership, paying rent to the partnership. The Leutholds own sixty per cent of the stock in the corporation, the balance being owned by others.

Caroline Leuthold first met John Fitzgerald in Toronto, when she went to Toronto with her friend, Janet Martin. Miss Martin at that time was engaged to a medical student at Toronto University by the name of Peter Spahn. On this occasion, Caroline was a house guest in the Fitzgerald home. Caroline next saw John Fitzgerald in March, 1942, when she went to Toronto on the occasion of his graduation from the University of Toronto medical school. In May, 1942, after Dr. Fitzgerald had graduated from the University of Toronto, he went to Johns Hopkins medical school, Baltimore, Maryland, to intern in medicine.

By May of 1942, the friendship of Dr. Fitzgerald and Caroline had developed to the point where the doctor was attempting to obtain the consent of his mother and Walter and Grace Leuthold to an early marriage of Caroline and himself, and to obtain a promise from his mother that she would assist him financially after he was married, he having no independent means.

Sometime in July, 1942, the doctor met a lady who is referred to herein as Mrs. X. This lady and her husband had both graduated from Johns Hopkins in 1940. Mrs. X

continued on at Johns Hopkins and was one of Dr. Fitzgerald's superior officers or instructors. Notwithstanding the doctor's professed love for Caroline at this time and his attempts to procure the consent of his mother and the Leutholds to his early marriage to Caroline, he admitted that, within two weeks after meeting Mrs. X, he had sexual intercourse with her, in her apartment at the hospital, on three different occasions. At this time, the husband of Mrs. X was not in Baltimore.

The doctor succeeded in having his mother and Grace Leuthold meet him in New York, and apparently he there overcame any objections to his marriage to Caroline which they had, and it was arranged that the marriage would take place in Spokane on September 2, 1942. The doctor came to Spokane for the wedding. He admitted that the evening before the wedding he called Mrs. X at Baltimore from the Davenport hotel. The doctor and Caroline were married September 2, 1942, and after a honeymoon went to Baltimore to live, where, as stated, the doctor was an intern at Johns Hopkins. A short time after Caroline and the doctor went to live at Baltimore, the doctor introduced his wife to Mrs. X.

During the time the doctor and Caroline were living in Baltimore, the doctor's mother sent him two hundred dollars per month. The doctor's father had died in 1940, leaving an estate consisting of a large three-story house in Toronto and some annuities which produced three or four hundred dollars per month. It was from this income that the doctor's mother had to live and from which she made her contribution to her son.

The doctor completed his internship at Johns Hopkins in December, 1942, and he and his wife then moved to Toronto. The doctor admitted that, after moving to Toronto, he wrote Mrs. X at least twice, and that she wrote to him, but, at the doctor's suggestion, Mrs. X directed her letters to his fraternity house. The doctor and his wife lived at his mother's home in Toronto, until he was called into active duty in the Canadian navy in 1943.

Sometime in January, 1943, Caroline discovered and read one of the letters the doctor had received from Mrs. X. The doctor stated that from this letter Caroline assumed that he and Mrs. X had continued their illicit relations after his marriage to Caroline. The doctor denied that any such relation with Mrs. X had continued after his marriage, but he admitted that he immediately destroyed the letters from Mrs. X, and so of course we have only the doctor's statement as to whether or not the assumption of Caroline had any foundation.

The doctor stated that, while Caroline was greatly concerned over the above letter, she continued to live in Canada until December 31, 1943, when she went home to Deer Park. Caroline was pregnant at that time, and John L. Fitzgerald (hereinafter referred to as Johnny), the little boy with whom we are here concerned, was born May 1, 1944, at the Sacred Heart hospital, in Spokane.

In March of 1944, at Caroline's invitation, the doctor came to Spokane to see his wife, who at that time was "camping out" with Sam and Betty in the former home of Walter and Grace, in Spokane. During this visit, the doctor drank heavily every afternoon and evening and would not get up until about noon. He again visited his wife in May or June of 1945. At this time, Caroline was living with her parents at Deer Park.

Perhaps it should be stated here that the Leutholds live just outside of Deer Park. They have a five-acre tract, about one acre of which is in lawn and flowers. Situated on this tract is the home of Walter and Grace, which is referred to as the big house. After Sam and Betty were married, they built a small house close to the home of Sam's father and mother, and their home is referred to as the small house. On the doctor's second visit, he and Caroline lived in the small house, and Walter, Grace, Betty, and Johnny were in the big house. On this visit, the doctor's habits as to drinking were about the same as on his former visit.

The testimony of the Leutholds and friends who were at Deer Park during the doctor's visits was to the effect that he did not pay much attention to Johnny.

It is impossible to tell just what may have influenced Caroline to start an action for divorce against her husband, but it is inferable that she was persuaded to do so by what she believed to have been the relations of her husband with Mrs. X, and his subsequent conduct towards her and Johnny. At any rate, in October, 1945, Caroline instituted an action for divorce against her husband, in the superior court for Spokane county. The complaint was based upon the alleged grounds of cruel and inhuman treatment. While the doctor admitted that he had received a copy of the summons and complaint, and knew that Caroline was asking for the absolute custody of Johnny, he made no appearance in the action. In fact, the doctor stated that it was understood between him and Caroline that if she procured a divorce she was to have the absolute custody of Johnny; that he felt that, if Caroline was to have their son, it was better that he sever all connection with him, and for that reason he did not ask for even the right of visitation.

On January 24, 1946, Caroline obtained an interlocutory decree, wherein she was given the absolute custody and control of Johnny, the doctor not being given the right of visitation. A final decree of divorce was entered July 30, 1946, confirming in all respects the interlocutory decree.

Sometime before the entry of the final decree of divorce, Dr. Fitzgerald had met and became interested in Janet Hansen, a widow. On July 27, 1946, the doctor wrote a letter to Caroline, in which he referred to Mrs. Hansen, and he informed Caroline that, while American divorces were recognized in Canada, they were so recognized only when the ground was adultery. He further stated that the only way he could get his freedom was for Caroline to sue him in Canada, basing the action on adultery, or for Caroline to marry again, in which event he could sue her in Canada on the ground of her technical adultery. We desire to here set out the testimony of the doctor which shows what he understood would have to be done, and what he was willing to do to procure his freedom.

"Q. When you say, 'on the ground of my adultery', what do you mean? A. That I would give her the necessary

grounds, as described in the letter, that I would give her the necessary grounds for divorce. Q. I beg your pardon? A. I would give her the necessary grounds for divorce. That is the Canadian law, the law of my country. Q. I have some difficulty in understanding you, Dr. Fitzgerald. What do you mean by that? A. Collusion. Q. Do you mean to say that you were attempting to induce Caroline to enter into a collusive divorce in which she would perjure herself by swearing that to the best of her knowledge and belief you had committed adultery, and that you would proceed and give her grounds upon which to perjure herself? A. She would not have to perjure herself at all. This could be arranged so that Caroline would not be involved. She would have to swear on the evidence that I had committed adultery, as I tried to explain in that letter. Q. She would have to swear that you had committed adultery, but you hadn't? A. No, sir. I would commit an act which one of her attorneys in Canada would swear had occurred, and produce the necessary evidence to prove that. She would sue me then on the grounds of my adultery, and get—she would be given a Canadian divorce and I would be free. Q. You talked this over with her? A. Yes. Q. And she refused to do it? A. In the United States and in Canada, both. . . . Q. Did you mean by that that you would register in a hotel with some woman, married woman or otherwise, for the purpose of giving her grounds for a divorce in Canada on the basis of adultery? A. Yes, sir."

Caroline executed a will on November 27, 1944, at which time she was the wife of Dr. Fitzgerald. By this will, she bequeathed to her then husband ten thousand dollars. Small bequests were made to members of her family, and to her cousins, Susan and Mary Sawyer, of Wenatchee. She nominated her husband, her father, Walter Leuthold, her mother, Grace Leuthold, her brother John (Sam) Leuthold, and her attorney, Arnold L. Graves, executors of her will and trustees of the trust created for her son and any other child or children who might be born to her. The trustees were given broad powers in handling the trust estate.

On October 5, 1945, which was about the time Caroline started her divorce action, she executed a codicil to her will of November 27, 1944, whereby she revoked the ten-thousand-dollar bequest to her husband, Dr. Fitzgerald, and also revoked the provision in the will nominating her

husband as one of the executors and trustees, directing that the remaining executors and trustees therein named act in that capacity.

Caroline and Dr. Harold E. Carnahan, of Spokane, were married December 27, 1946. Caroline died in Spokane on February 9, 1947, after a brief illness.

Johnny had lived with his mother in the Leuthold family the greater part of his life. After Caroline's marriage to Dr. Carnahan, they had Johnny with them for a short time prior to her death, and he remained with the doctor for about a week after his mother's death. Dr. Carnahan, becoming alarmed over the manner in which this little boy reacted to the loss of his mother, and knowing how much Sam and Betty Leuthold loved him, and how much he seemed to love them, decided that it would be best for Johnny to turn his custody over to Sam and Betty, which he did, and Johnny has since resided at Deer Park with Sam and Betty Leuthold.

In turning Johnny's custody over to Sam and Betty, Dr. Carnahan did not know that Dr. Fitzgerald was making or would make any claim to Johnny's custody. Dr. Fitzgerald had seen Johnny only on the occasions mentioned when he came to visit his wife, and had not seen Johnny since Caroline started her action for divorce. Dr. Fitzgerald married Janet Hansen in March, 1947.

On February 19, 1947, Walter Leuthold, Grace Leuthold, and John Leuthold filed the petition hereinbefore mentioned, asking that John Leuthold be appointed guardian of the person and estate of John L. Fitzgerald, a minor. The court fixed March 3, 1947, as the time for hearing the petition.

A few days before March 3, 1947, Dr. Fitzgerald and his sister, Mrs. Whitley, came to Spokane. Dr. Fitzgerald registered at the Davenport hotel under the name of Thomson, and his sister under some name other than her own. The doctor stated he so registered on the advice of his counsel.

On February 28, 1947, Dr. Fitzgerald filed the petition for a writ of *habeas corpus* hereinbefore mentioned. In this petition, he alleged that he was a resident of Toronto, Canada; that John Leuthold resided in Spokane county, near

Deer Park; that petitioner was the father of John L. Fitzgerald, a minor aged three years. The petition then refers to the divorce decree under which Caroline was awarded the custody of Johnny, and to the subsequent marriage of Caroline to Dr. Carnahan, and to Caroline's death.

It was further alleged that, subsequent to Caroline's death, his son was taken into custody by John Leuthold, and is now being unlawfully detained by John Leuthold at his residence in Deer Park.

It was further alleged that upon the death of his former wife, the right of petitioner to the care, custody, and control of his minor son was revived, and that John Leuthold's detention of such minor is illegal and in violation of the parental right of petitioner.

Upon the filing of this petition, an order was issued requiring John Leuthold to bring the minor into court on March 3, 1947, and restraining John Leuthold from removing such minor from the jurisdiction of the court.

On March 3, 1947, Dr. Fitzgerald served and filed an answer and cross-petition in the guardianship matter, wherein he asked that the Leuthold's petition be dismissed; that the court award the care, custody, and control of Johnny to him; and that the court appoint as guardian of Johnny's estate some qualified trust company.

On March 3, 1947, John Leuthold served and filed his answer and return to the petition for a writ of *habeas corpus*. On the same date, he also filed a motion for a continuance of the *habeas corpus* hearing. This hearing was continued to April 29, 1947, and, in the order of continuance, it was ordered that Johnny be placed in the custody of John and Betty Leuthold, pending the hearing, such award to be without prejudice to the rights of either party.

Interrogatories were propounded to Dr. Fitzgerald in Toronto on April 1, 1947, and the answers to such interrogatories appear in the record as defendant's exhibit No. 10.

On April 5, 1947, the court entered an order that a commission issue to take the testimony, by deposition, of the following named witnesses for Dr. Fitzgerald, at Toronto,

on April 14, 1947:  A. McCallum, Surgeon-Captain, RCN, Mrs. J. G. Fitzgerald, Dr. H. J. Cody, Mrs. T. F. Whitley, Mr. Peter Van Gelder, Mr. Harold B. Scandrett, Dr. H. K. Detweiler, Mr. Justice G. F. MacFarland, Mrs. William D. Bolton, Mr. Robert D. Stuart, and Mr. D., A. Lang.

The *habeas corpus* proceeding came on for hearing on May 19, 1947, and continued through May 29, 1947.  On June 26, 1947, the trial court made and entered its findings of fact, from which it concluded that the petition for the writ filed by Dr. Fitzgerald should be dismissed; that the care, custody, and control of the minor, John L. Fitzgerald, should remain with defendant, John Leuthold, until the further order of the court; and that defendant should have judgment against petitioner for costs.  Judgment was entered on June 26, 1947, in accordance with the conclusions of law.  Petitioner, Dr. Fitzgerald, has appealed from such judgment.

The *habeas corpus* proceeding is No. 30363 of the records of this court.

The guardianship matter came on for hearing before the court on July 7, 1947, and on the same day the court made and entered findings of fact, from which it concluded that John L. Fitzgerald, a minor, should be adjudged to be a ward of the court; that John H. Leuthold should be appointed guardian of the person and estate of such minor, and granted the care, custody, and control of such minor; and that the cross-petition of Dr. Fitzgerald should be denied and dismissed.  A decree was entered in conformance with the conclusions, from which decree Dr. Fitzgerald has appealed.

The guardianship matter is No. 30364 of the records of this court.

It was recited in the findings last above referred to that petitioners and cross-petitioner had stipulated that the evidence adduced in the *habeas corpus* proceeding should be considered by the court, for all pertinent purposes, as evidence in the guardianship matter.  The two appeals were consolidated or combined only for the purposes of briefs and

oral arguments before this court, and the briefs filed cover both cases. The three-volume, 1068-page statement of facts filed in the *habeas corpus* proceeding, No. 30363, is also to be deemed as filed in the guardianship matter, No. 30364. There was also an additional and separate statement of facts filed in cause No. 30364.

Appellant in cause No. 30363 makes some thirty-four assignments of error, and in cause No. 30364, twelve assignments of error. Appellant states in his brief:

"Both of these appeals involve the custody of a three-year-old minor child, John L. Fitzgerald. No. 30364, the guardianship proceeding, also involves guardianship of the estate of the minor child."

We shall first discuss the *habeas corpus* proceeding, No. 30363, and in so doing we shall not attempt to discuss each of appellant's assignments of error, as we think they all go to the ultimate question to be decided, namely, did the court err in refusing to award the custody of the minor to his father?

Appellant begins his argument by stating that a *prima facie* case in favor of Dr. Fitzgerald was made by the allegations of his petition, admitted by the answer of John Leuthold, showing that Dr. Fitzgerald is the sole surviving parent of Johnny. Appellant then quotes from *In re Gordon*, 19 Wn. (2d) 714, 721, 144 P. (2d) 238, as follows:

"In a *habeas corpus* proceeding instituted by parents to recover the custody of their minor child, it is incumbent upon the one detaining the body of the child to make a return to the writ and show facts justifying his detention of that child."

Appellant further states that the presumption is that Johnny's welfare will best be served by his being in the care and control of his father.

It may be admitted that, upon the death of Johnny's mother, Dr. Fitzgerald's bare natural right to the care, custody, and control of his son was revived, but nevertheless, this being a case involving the custody of a minor, the controlling question before the court is the welfare of the little boy.

We are clearly of the opinion that the following general rule stated in *Warnecke v. Warnecke*, 28 Wn. (2d.) 259, 182 P. (2d) 699, is the rule applicable to the facts in this case:

"In cases of this kind, the welfare of the minor children is the sole matter with which the court is concerned. Their custody is of supreme importance, *regardless of the claims and personal desires of the parents*. Even the wishes of children in such cases must yield to the determination of what is for their ultimate good." (Italics ours.)

The trial court found that:

"John [Sam] and Betty Leuthold are completely devoted to the minor John L. Fitzgerald. Their love for him is deep, sincere and real and he, in turn, loves them and depends on them utterly. Grace and Walter Leuthold are equally devoted. The home life of these four adults is marked by consideration, kindness and affection. Each of them is deeply and sincerely religious [the Leutholds are all members of the Episcopal Church] and under their supervision the minor John L. Fitzgerald is receiving careful early religious instruction. John and Betty Leuthold, in the care of the minor, make provision for his companionship with children of his own age. He is a well trained, obedient child, kept to a regular schedule and under the supervision of John and Betty Leuthold is receiving physical and emotional training that is ideally suited to his temperament. John and Betty Leuthold are eminently fit persons to have the care, custody and control of the minor and his welfare will be best served by entrusting him to their custody."

The evidence is so conclusive that appellant admits all of the facts stated in the above finding, except that the welfare of Johnny will be best served by entrusting him to Sam and Betty Leuthold. Specifically, the doctor admits that the Leutholds are a congenial, happy family group; that Walter and Grace love children; that Sam and Betty have for Johnny the same love and affection parents would have, and that Johnny has for them the love a child has for its parents; that Johnny was shown to have been shy and nervous, a little lost boy, shortly after his mother's death, and that he was shown to have "come out of it" and to be a normal, healthy boy; that Johnny is receiving religious training in the Leuthold household, and that Sam, Betty,

Walter, and Grace Leuthold are all persons of sincere and deep religious faith.

One of the most convincing pieces of evidence showing the interest and love that all of the Leutholds have had for Johnny since his birth is defendant's exhibit No. 2, which consists of some seventeen pages of photographs showing Johnny and his mother, and Johnny and other members of the Leuthold family, from the time of his birth up to May, 1947. These pictures, many of which were taken at a time long before the instant proceedings were contemplated, show more plainly than words the attitude of every member of the family towards Johnny.

As stated, appellant admits the facts above stated but contends that, notwithstanding such facts, he should not be deprived of the custody of his son, unless it appears from the evidence that he is utterly unfit to have such custody. He contends that the evidence does not show such unfitness.

It may be admitted that a natural parent should not be deprived of the custody of his or her child merely because some person other than such parent may desire to have the care and custody of such child, and may have more of this world's goods with which to give the child advantages which the natural parent cannot give.

But can it be said that the trial court was not justified in concluding that appellant was unfit to have the care and custody of this little boy, when it appears by his own testimony that his moral standards are such as to permit him, at a time within a month prior to his marriage to Caroline, and when he was professing love for her and attempting to gain permission of his mother and Caroline's parents to an early marriage, to indulge in relations with another woman, such as he admitted having had with Mrs. X, and to continue to keep in contact with this woman for a considerable time after his marriage; and which standards are such as to permit him to endeavor to persuade his wife to obtain a collusive divorce from him in Canada, he to furnish the evidence which would form the basis for the divorce, in order, as he said, that he could be free.

We reiterate, can it be said that the trial court was not justified in concluding that this man was unfit to have the care and custody of his son—this man who professes such love for his son and yet who admits that he agreed that his wife should have the custody of their son, who was willing to sever all relations with him and did not even desire the right of visitation, and who even contemplated that Caroline might marry again and that her future husband would probably want to adopt Johnny—this man who had seen his son only three times for short periods before he came to Spokane in March, 1947, and who had made no effort to see him after Caroline obtained her divorce—this man who admits that during his college days and during the time he was doing his intern work he was accepting from his mother almost half of her income for his maintenance, and who will be largely dependent upon her and his present wife for some time to come—this man who has no home of his own to which he could take Johnny (and it is problematical when he will have)—this man who comes to Spokane and registers at a hotel under an assumed name?

Why did appellant register under an assumed name? In so far as the record shows, the Leuthold family had shown him every consideration, and there would seem to have been no reason, if the doctor had the welfare of the child at heart, why he could not come openly to Spokane and talk to the Leutholds openly and frankly about the boy.

And again we ask, why this sudden interest in Johnny? Can it be that the doctor's interest was in any way motivated by the fact that Johnny, under his mother's will, had inherited an estate valued at between $250,000 and $300,000? The doctor denies that he was influenced by this fact, and attempts to support his position by stating that he was not asking to be appointed guardian of Johnny's estate. However, we think it quite apparent that if the doctor were awarded Johnny's custody, he would be justified in asking that the court make a reasonable allowance to him for the boy's support and education.

There is another occurrence shown by the record, which is difficult to associate with a father who has the best

wishes of his son at heart. It will be remembered that Caroline's will was made prior to her marriage to Dr. Carnahan. She never changed her will after this marriage. Dr. Fitzgerald did not remember just the date when he saw Caroline's will, but he had knowledge of it. The following questions were asked the doctor in regard to this will:

"Q. Do you know, also, that it is the law of the state of Washington that if Dr. Carnahan, and only Dr. Carnahan, sees fit to do so, he may set aside this will, by virtue of that fact take away half of the property which the will gives to Johnny? . . . Q. Do you know that? A. I assume that to be correct, that he could do so. Q. And by virtue of doing that, that would take from Johnny half of the estate that his mother gave him by her will? A. I assume that to be correct. . . . Q. Dr. Fitzgerald, you stated that you assumed that was correct. Had you been informed of that correctness by an attorney? A. I think I was informed of it at home, sir. Q. In Canada? A. Yes, sir. Q. By your attorneys? A. Yes, I believe that is correct. . . . BY THE COURT: Q. In any event, you had that in mind at all times after the death of Caroline? A. I don't understand you, sir. Q. You had that knowledge in mind? A. I had that knowledge in mind. Q. At all times after her death? A. Yes."

It is not material here whether or not what the doctor understood to be the law is in fact the law of this state. The material fact is that he assumed the above to be the law.

Having in mind the above situation, and also having in mind that under Caroline's will, Sam Leuthold was made the residuary legatee in the event of the death of Johnny, without issue, we find counsel for appellant calling Dr. Carnahan and asking for an interview. Dr. Carnahan called at the office of counsel for appellant, and there Caroline's will was discussed, and the doctor was informed that the will was null and void, as it was made before his marriage to Caroline, and he had not been mentioned in it. He was also informed that he had six months in which to contest the will. He testified:

"Q. Did he say to you what would be the financial result to you of contesting the will? A. I believe he did

mention that it would be divided equally between the father and the son. Q. Half would come to you and half would come to Johnny? A. Yes. Q. Under the terms of the will it all goes to Johnny, did you know that? A. Yes, sir."

Dr. Carnahan was also informed that, if he contested the will, there was a chance that he would be appointed administrator. However, the doctor stated that he had already been advised by the attorneys for the Leutholds of his right to set aside the will if he desired to do so.

The only inference which can be drawn from the facts disclosed by the foregoing testimony is that Dr. Fitzgerald, believing the legal situation to be as above stated, was willing that Johnny be dispossessed of one half of his estate, in order that the Leutholds be removed from the picture as executors of Caroline's will and trustees of Johnny's estate, and that Sam Leuthold lose any right he might have as residuary legatee. It would also follow that, if Caroline were decreed to have died intestate, the doctor would become Johnny's heir.

We think no further comment necessary in regard to the facts last above stated.

It may be admitted that Dr. Fitzgerald's family stood by him in these proceedings, although undoubtedly it must have been something of a shock to his mother and the doctor's present wife to learn some of the facts revealed in the hearings, for undoubtedly appellant's mother is a fine woman, as is his present wife. His mother stated that she was willing to continue to contribute to the support of the doctor and his family until he was able to maintain them, apparently contemplating that this situation would continue at least until sometime in 1950. She was willing that the doctor, his wife, and Johnny live in her home, and she hoped that, when the doctor started to practice, he would take over her home. His present wife stated that he had talked with her about Johnny before they were married, and that while she would like to have children of her own, she was willing to take Johnny; that she had agreed to contribute, if necessary, from her own money the sum of one

hundred dollars per month to help support the family. The present Mrs. Fitzgerald has no children of her own and had never seen Johnny until she came to Spokane for the hearing.

The Fitzgerald family is an old Canadian family. Appellant's father was an eminent man in Toronto in the medical profession. It would seem to us to be perfectly proper, in considering whether or not Johnny's welfare would be best served by awarding his custody to his father, to consider the environment which would surround him in his new home, and in so doing to consider whether or not, regardless of the professed desire of the members of the Fitzgerald family to have this little boy, he would be received into the family and given the love and affection which is his due, in view of the fact that indirectly he was the cause of all the unfavorable publicity given to appellant by these proceedings.

Appellant stresses the testimony of his character witnesses, who testified to the effect that they knew of no reason why appellant would not be a proper custodian of his minor son. Among these witnesses, whose depositions were taken in Toronto, was Dr. Henry John Cody, chancellor of the University of Toronto. Dr. Cody was a man seventy-eight years of age. He had been a friend of appellant's father and mother for many years. The chancellor had recommended appellant's father for the deanship of the faculty of medicine of the University of Toronto.

Mr. George Franklin McFarland, justice of the high court of justice of the province of Ontario, had known appellant's parents for forty years. His family and the Fitzgerald family had visited back and forth. The justice stated he had never heard anything against appellant.

Dr. Archie McCallum, medical director general for the Royal Canadian navy, knew appellant as one of his medical officers. The doctor's knowledge of appellant was confined largely to his interrogation of appellant, and he could not point to any person to whom he had talked about appellant.

Mr. Hendrik Peter Van Gelder, at the time his deposition was taken, was consul of the Netherlands, in Toronto.

He had known appellant's father and mother since 1912. When the witness was married in 1927, Dr. Fitzgerald, Sr., was his best man.

Dr. Herbert K. Detweiler is in the private practice of medicine in Toronto. The witness knew appellant's father when the witness was a student and Dr. Fitzgerald, Sr., was a lecturer at the University of Toronto.

It may be admitted that all of the above-mentioned gentlemen are men of prominence, and it may be also admitted that they were sincere in stating that they knew of no reason why appellant would not be a proper custodian for his minor son. However, it does not appear that any of these witnesses knew any of the facts which were brought out in this proceeding, and which formed the basis for the court's conclusions. After reading the testimony of these gentlemen, we are strongly impressed that, to a very large extent the real basis of their opinion of appellant is found in a statement made by Dr. Cody that

" . . . everybody knew him as his father's son. Naturally, he was the son of the most outstanding medical man on the staff [of Toronto University]."

Dr. Fitzgerald took the deposition of two other character witnesses, one of whom was Mr. Robert Stuart, a young man about the age of the doctor. He first met appellant when they were both attending Upper Canada College, from 1928 to 1934. This witness stated that he had been in the Fitzgerald home many times, and the doctor had been in his home. Mr. Stuart did not see appellant after the latter went to Baltimore, except on one occasion after the doctor had finished at Johns Hopkins. Mr. Stuart saw appellant again in the spring of 1946 and has seen him frequently since that time. Mr. Stuart stated he had never known the doctor to use liquor to excess, and that he knew of no reason why appellant should not have the custody of his son.

Mr. Daniel Lang was also called as a character witness. This young man was twenty-seven years old, and not married. He also knew appellant at Upper Canada College.

The witness saw very little of appellant from the time he finished the preparatory school until he met him in Halifax in 1943, on an occasion when Lang was passing through. He next met the doctor in 1944, when he was appointed to a ship in the Canadian navy upon which appellant was the medical officer. Mr. Lang and appellant were on the same ship from October, 1944, to April, 1945. Mr. Lang stated that in the fall of 1945 appellant telephoned him to the effect that he had parted company with his wife, Caroline. Mr. Lang was of the opinion appellant would be a proper custodian for his son.

We have read the cases cited by appellant. We fully appreciate what was stated in some of them, such as *Lovell v. House of the Good Shepherd*, 9 Wash. 419, 37 Pac. 660, 43 Am. St. 839, relative to the rights of the natural parent, and we do not desire to be understood as holding that the rights of the natural parent are not to be given consideration in custody cases. However, the facts in the particular case must be considered in order to understand the basis of the opinion, and, when that is done, we are of the opinion that we have consistently announced that in custody cases the controlling question is the welfare of the minor. As stated in *Pardee v. Pardee*, 21 Wn. (2d) 25, 31, 149 P. (2d) 522:

"The court, in arriving at what would be best for the welfare of these young children, had many things to consider—not only the fitness of the respective parties, but also the homes to which the children would be taken, the financial ability of respondent to provide for the children wherever situated, and other questions which the trial court was certainly better able to determine from observing all the witnesses than are we from reading a cold record."

After a consideration of all the testimony in this case, and the many exhibits introduced, we are clearly of the opinion that there is ample evidence to support the finding of the trial court that appellant is an unfit person to have the care and custody of this little boy, nothwithstanding that Johnny is his own son, and also to support the finding that the welfare of Johnny will be best served by leaving him in the custody of Sam and Betty Leuthold.

It follows that the trial court did not err in concluding that appellant's petition in the *habeas corpus* proceeding should be dismissed; that Johnny should remain in the custody of John H. (Sam) Leuthold until the further order of the court; and that respondent John H. Leuthold should have judgment against appellant for costs. The court did not err in entering judgment in accordance with such conclusions.

For the reasons herein stated, the judgment of the trial court in the *habeas corpus* proceeding is affirmed.

The guardianship matter was heard on July 7, 1947, and a decree was entered the same day, appointing John H. (Sam) Leuthold guardian of the person and estate of Johnny. From this decree, Dr. Fitzgerald has appealed.

It will be remembered that all the evidence introduced in the *habeas corpus* proceeding, in so far as material, was to be considered by the court in this action.

It will also be remembered that Caroline, at the time of her death, was the owner of a twenty per cent interest in the Deer Park Lumber Company, a partnership, and also had an interest in the holding corporation, Deer Park Pine Industries, of which Sam Leuthold was president. In addition to the interest Johnny had in the estate of his mother, he was also the beneficiary of an insurance policy which Caroline carried, in the amount of $5,000, and of certain bonds of the face value of about $18,000, making a total of between $22,000 and $23,000.

While appellant asked to be appointed guardian of the person of his minor son, he asked that some trust company be appointed guardian of Johnny's estate, and contended that Sam Leuthold should not be so appointed, for the reason that there might be a conflict between the interest of Sam and that of his ward. Appellant claimed that this possibility of a conflict might arise, because part of the estate of the minor consists of stock in the Deer Park Pine Industries, of which Sam is president, and a partnership interest in the Deer Park Lumber Company, Sam Leuthold also holding an interest in both concerns, and because Sam Leuthold is a contingent remainderman under the will of Caroline.

The integrity of Sam Leuthold has not been questioned in these proceedings, nor has the fact that he has the same love and affection for Johnny as he would have for a son of his own. It would seem that, in working to make his own interest in the above concerns more valuable, he would of necessity make the interest of his ward more valuable. There can be no question but that Caroline had the greatest confidence in her brother Sam, for she made him one of the executors of her will, and one of the trustees to administer the trust set up for Johnny.

It is also apparent that Caroline was satisfied with the manner in which the affairs of the Deer Park Lumber Company were being conducted, as she directed in her will that her share in the partnership be not withdrawn upon her death, and she authorized her executors and trustees to do all acts and things deemed necessary, advisable, or proper to facilitate the continuance of the business, to the end that such business should not be hindered or interfered with in any degree by her death.

In view of the situation presented by the record as we see it, we cannot visualize that there could be or will be such a conflict between the interests of Sam Leuthold and his ward as would cause Sam to take any action which would be detrimental to the interest of his ward. To the contrary, it seems to us that there is every reason in this case for the appointment of Sam Leuthold as guardian of Johnny's estate, in order that the two concerns hereinbefore mentioned be permitted to operate as they have in the past.

■ Again, we are satisfied that the trial court was entirely justified by the evidence in this case in making Johnny a ward of the court; in appointing Sam Leuthold guardian of his person and estate and awarding to Sam Leuthold the care, custody, and control of the minor; and in dismissing the cross-petition of appellant.

Inasmuch as these two cases were consolidated for the purpose of briefs and oral argument on this appeal, costs on appeal will be allowed only in the *habeas corpus* proceeding.

424

We appreciate that the following statement contained in respondent's brief is a most serious charge to make against a father, but we are satisfied that it concisely states the conclusion at which one must arrive from a reading of this record. We quote:

"We need not go further to inquire into this young man's motives; for if he has ever given one disinterested thought, or made one contribution to the welfare and upbringing of his son, this record does not disclose it."

In conclusion, may we say that we have not discussed more fully the testimony of some of the witnesses called by respondent, in view of the facts admitted by appellant, and we have not discussed the testimony of some of the witnesses whose testimony was taken by deposition, which witnesses were called by appellant, for the reason that, in our opinion, such testimony added nothing material to a consideration of this case.

We feel justified in making the comment that counsel for both appellant and respondent have furnished the court with exceptionally fine briefs, which presented fully and fairly the respective contentions of their clients.

For the reasons herein assigned, the decree entered in the guardianship proceeding is affirmed.

MALLERY, C. J., BEALS, STEINERT, and SCHWELLENBACH, JJ., concur.

May 14, 1948. Petition for rehearing denied.