## CHARLOTTE DURR *v.* GRAYDON DURR.
[No. 8, April Term, 1931.]

*Decided June 9th, 1931.*

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William A. Gunter,* for the appellant.

*Urner G. Carl,* for the appellee.

Bond, C. J., delivered the opinion of the Court.

Questions of fact only are presented for consideration in this case. The suit was filed originally by a wife for a divorce *a mensa et thoro,* alimony, and custody of a child of the marriage, and the husband filed a cross-bill seeking an absolute divorce on the ground of adultery by the wife. The court below found the adultery proved, granted the absolute divorce, and awarded the custody of the child to the husband. The first question is whether this finding is supported by the evidence; and, if it should be found not so supported, then a question of proof of desertion by the husband, as charged in the wife's original bill of complaint, would remain to be determined. On the final questions of fact there is conflicting evidence, and different explanations of incidents testified to render it difficult, or impossible, to determine their significance with assurance. On the other hand, the testimony is in agreement on some facts of importance.

The couple were married on June 5th, 1927, when the wife was fifteen years old, and their child was born in the following September. They lived together harmoniously, however, until April of 1930, mainly at a house built by the husband and an older brother, at Cresap Park, in Allegany County, near his place of employment. During that period there was no cause for complaint by either one party against the other, except possibly in disappointment by the wife at not being taken out to evening entertainments, a disappointment that is suggested by her, but not definitely made a cause of complaint. The husband answered that his hours of work did not permit his going to evening entertainments. On April 5th, 1930, the child being sick, both the husband and the wife took it to the home of the wife's mother, in Garrett County, and shortly after, as the child's condition did not improve, they took it to the home of the husband's mother, also in Garrett County, for care and treatment. The hus-

band, for some reason not explained in the testimony, was disposed to blame the wife for the child's sickness. Pneumonia developed, and the child was confined to the house of its paternal grandmother for a month or more. The mother remained living at that house with the child, and the father went back from his work often to see it. On April 13th, he urged his wife to return with him to their home, but she decided to remain where she was, with the child, and there was evidence of some irritation on the husband's part because of this. The wife testified that, in argument over going back, the husband, as he was going away, kicked her once; and that is denied by him. On April 21st, the husband was at his mother' house again, and, as the condition of the child had improved, he asked the wife to go back with him, but she refused, and said in her testimony that she urged him to go with her to a dance to be held in the county that night. He replied that it was necessary for him to go back to Cresap Park that night in order to be at work in the morning. In further conversation the wife then declared that she did not intend ever to go back with him, and live with him further. Some time later, her attitude changed, and she asked to be taken back, but the husband refused, because, as he said, of her previous refusal. Shortly after April 21st, 1930, the wife went to live at the house of her own mother, leaving the child with her mother-in-law. She explained her leaving by saying that she had become unwelcome at the house of her mother-in-law, but cross-examination left the explanation somewhat weakened, as there appeared to be no perceptible reason for her believing it to be true.

The adultery is charged to have taken place between the wife and Daniel Durr, a younger brother of the husband, twenty years old, while the wife was living at her mother-in-law's house, and afterwards. Daniel Durr testified circumstantially to the offenses, and in respect to some of the circumstances his testimony was concurred in by the wife herself, although she denied actual adultery. Testimony of both these witnesses agreed that on April 19th, 1930, the wife left the house afoot, telling her mother-in-law, Mrs. Durr,

that she was going to visit an aunt, and that, instead of doing so, she met Daniel Durr in his car at a place removed from the house, started toward a dance ten or twelve miles distant, and, instead of going on to the dance, turned off the main highway into a byroad, stopped the car, and spent three or four hours together there, returning home at about 2.30 o'clock in the morning. Two young men testified to having passed the car, where it was stopped on the byroad, and to having seen Durr, but not his sister-in-law, in it. Durr testified to intercourse there twice. The wife, on the other hand, testified that Durr had spent the time trying to seduce her, but had not succeeded. On the next day, she described to her mother-in-law a visit to the aunt. Two evenings later, that is to say, on April 21st, the evening on which her husband had again urged her to return with him to their own home, the wife went to another dance, at another place in the county, and, declining to go with her sister-in-law and some friends, joined Daniel Durr again, on her own initiative, and drove to the dance with him in his car, alone. The two spent a short time at the dance, then, from 10 o'clock to the close of the dance at about 1.30 o'clock, sat together outside in Durr's car; and after driving along toward home for some distance, in company with the car of the sister-in-law and friends, turned into a side road about four miles from home, stopped and spent one or two hours together. They reached home about twenty minutes of four in the morning. Daniel Durr again testified that intercourse took place on this expedition, and the wife denied it. Daniel Durr testified to intercourse at several other times, but proof of such additional occurrences is confined to his own testimony, except that members of his family testified to free resort by Daniel Durr and the wife to the rooms occupied by each other

There are obvious reasons for taking up the testimony of Daniel Durr with distrust, and scrutinizing it closely. There was an earlier proceeding and hearing on a writ of *habeas corpus* sued out by the wife to obtain custody of the child, and Daniel Durr did not testify to adultery in testimony given by him then on the question of the wife's fitness for the

custody. And, of course, the relationship of this paramour to the husband who seeks the divorce, and a seeming absence of any resulting animosity between him and the husband, naturally suggest the possibility of collusive testimony, or connivance in bringing about the offense. Here, on the other hand, there was no strong attachment between the husband and the wife, and, this being true, it is conceivable that animosity between the brothers might not be aroused by the misconduct of Daniel and the wife. The trial court, while fully mindful of the necessity of distrusting the testimony of the paramour to adultery, was led to the conclusion that in this instance the adultery must nevertheless be taken as proved. And, on appeal, this court concurs in that conclusion. The testimony of Daniel Durr, as it appears in the record, seems credible, despite its easy susceptibility to attack. The wife supports it in respect to all the facts of close association, clandestine meeting, private expeditions, and sojourn together late at night in secluded places. Those admitted facts would alone give rise to a suspicion, if not to an inference, of wrongdoing. The trial court, in studying the effect of the evidence, had the advantage of the appearance of the witnesses before it as their testimony was given, and its conclusion reached with that advantage must influence the decision on appeal. *Moran v. O'Brien,* 156 Md. 221, 222, 144 A. 257. Whatever force there may be in an argument made on behalf of the appellant, that the husband, in view of the circumstances of all the relations of the parties, does not deserve to have this consequence attached to the acts of wrongdoing testified to, the argument is not a legal one. The grounds of divorce are fixed by statute, and the statute admits of no discrimination between plaintiffs according to their deserts, so long as there has been no collusion, connivance, or condonation, and there has been none shown by the testimony here.

On the question of the custody of the child, there had been, as stated, a hearing before the same trial judge on a writ of *habeas corpus* sued out by the wife before she entered the suit for divorce; and the child had then been awarded to the

father. The decree of divorce embodied a like order. Apart from the fact of adultery by the wife—the fact which had not been testified to at the hearing on the writ of *habeas corpus*—it appeared that custody by the wife must result, for the present, at least, in the raising of the child in the home of its mother's parents, and there was testimony of drunkenness at their house, and resort to it by such an unusual number of visitors as to arouse suspicion in the neighborhood as to the character of the house. Custody by the father will, on the other hand, result in the raising of the child for the present at the house of his mother, and the evidence tends to show a likelihood of good care there. In the fact that, when the child's sickness became grave, its parents united in removing it from the house of its maternal grandmother to that of its paternal grandmother for special care and treatment, there seems to be an argument for a preference by the court of the latter place. And here again, the court had both grandmothers before it to aid in deciding the question. We conclude that, unless and until conditions arise hereafter to contradict or alter that decision, it should stand, and be affirmed. *Kerger v. Kerger,* 156 Md. 607, 609, 145 A. 10.

*Decree affirmed, the appellee to pay costs.*