## Commonwealth ex rel. Kreiling *v.* Kreiling, Appellant.

Argued December 11, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT and RENO, JJ. (JAMES, J., absent).

*James C. Tallant,* with him *Paul J. Abraham,* for appellant.

*Andrew S. Romito,* with him *Paul G. Schaefer,* for appellee.

OPINION BY BALDRIGE, P. J.; January 25, 1945:

An appeal involving the custody of small children always presents a perplexing problem. That is especially true when, as here, the father and mother are the contending parties. The court below in this habeas corpus proceeding concluded that the mother is the proper person to have the custody of her three small children, three, five and eight years of age. The father of the children appealed. We granted a supersedeas on his application, and the children are now in his care.

The parties were married January 1, 1935, and lived together until February 18, 1944, residing during the last five years in Homewood, part of the city of Pittsburgh. The father of the children is a dispatcher for the Blue Ridge Bus Line and works daily from about noon until nine or ten o'clock in the evening. Apparently, the married life of this couple, if not always calm, was not chronically stormy until the late fall of 1943 when Lt. McCahill, a lieutenant in the Air Corps, became attentive to this relatrix. From that time until she left her home on February 18, 1944, and went to New York, she saw him on different occasions and they exchanged

a number of amatory letters, assuring each other of a deep and abiding love, with references to their future marriage. In one of his letters mailed January 9, 1944, in which he addressed her as "darling" he said: "I consider you my wife now. At least, we love each other so much that it unites us more than even a ring and license could. Although we are going to get that ring and license someday. Everything legal. But until then, you are my wife anyway. I love you very much darling." The letters are all of that same endearing and affectionate nature. Many references were made to his having kissed and embraced her. All the evidence indicates that she was entirely willing to abandon her husband and that her overflowing love for McCahill submerged her maternal obligations.

In her direct examination on the stand she stated that she last saw McCahill February 16, 1944, and she had not heard from him since and did not know his whereabouts. She denied also that she loved him. She further testified that she was at her mother's home and was not out of the city of Pittsburgh from the 18th of February to the 26th inclusive. When she was confronted with her own writing contradicting these statements she had to confess that she went to New York on February 18 to see McCahill and remained there at the Hotel Fulton for five or six days and part of this time was in his company.

There was no direct evidence of any criminal intercourse, but the expression in these letters and her behavior as a married woman with this officer furnish a reasonable foundation for the conclusion that she completely surrendered herself to his embraces. When she returned to Pittsburgh she went to her parents' home. After her departure the children were taken by the father to Murraysville, where he resides with his parents, who concededly are very reputable people. Although she knew where the children were, and had been told she could visit them, she remained away and did

not see them until May 3, when they were brought into a hearing in the courthouse at Pittsburgh. She attempted to account for her apparent indifference by saying that she had no way of getting to Murraysville. There was evidence that there were bus lines running in close proximity to where the children were.

It was testified that this mother kept company with a Mr. Pressey, one of her neighbors, who was a married man and that she went out at night without leaving anyone to care for the children; that she slept until about noon; that she required the children to dress themselves and get their own meals and she failed generally to give them proper care and attention. The record discloses that she visited drinking places and on a few occasions became intoxicated. Her relations with Pressey were of such a nature that aroused the jealousy of his wife. She testified that there was a "definite affair" between her husband and Mrs. Kreiling, and that she frequently waited at home while he was out with her and the Kreiling children often times were in their home by themselves.

The relatrix acknowledged that she had been out with Pressey on one occasion to a drinking place, but denied having any improper relations with him. When asked on cross examination if she was in love with McCahill she refused to answer, but in a letter she wrote to him just before leaving New York, when he was apparently in camp nearby she said: "Darling, I love you and I want you to come back to me. You will probably think I'm weak and just came here to have a good time. I came because I wanted to be with you. I'll never be sorry for it sure was wonderful." She expressed her determination therein to get a divorce and assured him that she would try to write every day and as soon as she had a safe place to receive his letters she would inform him. In an attempt to excuse her conduct she testified that her husband drank excessively and made general accusations, that he struck, choked

and threatened to kill her, without giving any dates or details; that it was her fear of him that caused her to leave her home. If she had left under different circumstances and at a time when she was not yearning to go to New York to see McCahill her story would have been more convincing. She denied neglecting the children stating that she took good care of them, kept their clothes clean and exercised a. motherly care over them and that she had been true and faithful to her husband. We give little, if any, credence to her testimony. She flagrantly, deliberately, and persistently falsified when on the stand. She is living with her mother and father at Turtlecreek in a six room house and the mother said she was willing to have her daughter and her children live there. Her father did not testify, nor was his absence explained.

The children have gained weight, attend day and Sunday school regularly, and apparently are contented at their paternal grandparents' home. The Kreilings live in a six room house with bath, located in a large yard in which are swings and a box for the children to play in, and in addition they have a vegetable garden, and raise their own poultry. This home, with such surroundings, is apparently a healthy, comfortable place for the children to be and they get the supervision and care which seems to be for their best interest. While children of this age are generally given to the custody and control of the mother, her right thereto is not absolute, it must yield to the best interests and welfare of the children: *Latney's Appeal,* 146 Pa. Superior Ct. 20, 22, 21 A. 2d 521. "The cardinal consideration is ever the welfare of the child, which includes its physical, intellectual, moral, and spiritual well being. To this the rights of parents and all other considerations are subordinate." *Commonwealth ex rel. v. Daven et al.,* 298 Pa. 416, 419, 148 A. 524.

We have given consideration to the conclusion reached by the learned court below, who heard the

parties and witnesses, but the ultimate duty rests upon us to exercise our independent judgment in this matter: *Commonwealth ex rel. Goessler v. Bernstein,* 149 Pa. Superior Ct. 29, 26 A. 2d 213. We all are of the opinion that the permanent interests and welfare of these children will be best subserved if they remain under their father's care. He has expressed his willingness that the mother should have the custody of them for a month in the summer and that once each week she should have them for several hours at some mutually convenient time and place. Arrangements to that end can be worked out under the direction of the court below.

The order of the court below is reversed. The record is remitted so that an order may be made in accordance with this opinion. Each party to the appeal to pay his or her own costs.