[No. 32860.   Department Two.   October 14, 1954.]

WILLIAM V. CHRISTIAN, *Appellant*, v. DEMETRA D. CHRISTIAN, *Respondent*.[1]

[1]Reported in 275 P. (2d) 422.

*Lee Olwell* and *Ernest Duncan*, for appellant.

*Geo. H. Crandell*, for respondent.

WEAVER, J.—This appeal presents but one question: the right to custody of two minor children, one son born in June, 1949, the other in September, 1953.

As this court said in *Warnecke v. Warnecke*, 28 Wn. (2d) 259, 271, 182 P. (2d) 699 (1947):

"Hardships will necessarily follow any decree that could be herein rendered; and justice demands that, if possible, they be distributed so as to bear lightest on the unoffending party."

The trial court found that the wife had been guilty of adultery, and having denied it, committed perjury. Finding that the husband had not been guilty of cruel treatment towards his wife, as alleged in her cross-complaint for divorce, a decree of divorce was granted to the husband. Based on a finding

"That each of the parties hereto are fit and proper persons to have the care and present custody of said children,"

the children were awarded to the wife. The appellant husband assigns error to that portion of the quoted finding of fact in so far as it refers to respondent.

The parties were married June 26, 1946, while both were in the United States navy. In a few months, appellant was sent overseas. He returned in July, 1947.

Shortly thereafter, one of respondent's fellow workers at the base committed suicide. Respondent admitted to appellant that the man had been infatuated with her. Appellant was questioned by Navy Intelligence concerning the suicide.

Later, appellant found a letter, or a copy of a letter, addressed to another man in respondent's handwriting. The letter was not available at the trial. Appellant packed his clothes and left the family home. Respondent then attempted to jump from the top of a hotel in San Diego. Subsequently, in a conversation between the parties about the

letter, respondent admitted her unfaithfulness, admitted she had relations with the man, and named him. After respondent assured the appellant that it would not happen again, the parties were reconciled.

Although the facts to this point have been derived, for the most part, from appellant's testimony, a letter written by respondent to appellant's mother corroborates them. Respondent wrote:

"While he was overseas I stepped out on him—if it had been just that it wouldn't be quite so bad but the relationship went farther. And then there were some letters. . . . I made a fool of myself . . . Loving him as I do I cannot see how I was ever unfaithful to him—but I know now I have learned my lesson and if he ever gives me another chance God knows I will never do anything to hurt him again. . . . So don't be too hard on him—he's really in the right. . . .

"The Chaplain brought Bill to the hospital Tuesday the 21st (day after I was turned in) and I saw him shortly before he had to return to his ship . . . He was fine then but of course terribly hurt and unhappy . . . . All the fellows on the ship rib him because he used to stay aboard ship all the time and was faithful only to come home to such a situation. I don't know how he found out or where he got the letter but that isn't important to me. . . ."

When the parties were discharged from the service, they established their own home in Seattle. In January, 1951, the navy recalled appellant to active duty. He served in Korea for eight months and was discharged in May, 1952. During 1951, respondent was employed. Except for a period of about four months in 1953, respondent retained her employment and at the time of trial was earning approximately $275 a month.

April 2, 1953, shortly after noon, appellant returned home unexpectedly from work. The happenings thereafter can best be told by quoting his testimony:

" . . . I looked in the living room, saw no one there, and I supposed my wife was upstairs. I walked upstairs and as I got to the top of the landing she came out of the guest bedroom, which is located there, putting a robe around her. Q What other clothes did she have on? A None. Q Then

what took place? A When they, she, as she came out the door, she closed the door behind her, which led me to believe there was something underhanded going on there. Consequently I went into the room, and it was very dark and the shades were pulled down, and I looked around and saw some clothes that belonged to someone hanging across the baby's crib. And upon investigation, I went around the bed and found the fellow in the nude, completely in the nude, lying on the floor under the bed. Q. What did you do then? A I went downstairs, called the police, asked them to come out and witness the thing. Q Thereafter did any police arrive? A Yes, two policemen arrived and listened to the testimony of the fellow that was there. Q Do you remember the names of the officers? A Yes, there was a Patrolman Dodge, and Patrolman Lui. Q How soon after you called the police did they come? A Immediately. Q After making the phone call, did the man who was in the house come downstairs? A Yes, he did. He got dressed and came down stairs. Q What took place then? A I told him to wait there, was still on the phone trying to get the police. I told him to wait there, and he waited a moment and then he tried to make a break for the door and tried to get away, and I detained him and kept him there until the police arrived shortly afterwards."

Appellant further testified that the man (found upstairs) ". . . said that he and my wife had had an affair and that he was very remorseful about it, being caught and everything, and he was in general very shaken up about the thing."

One of the police officers testified that the man stated that he had been indiscreet.

This man was subpoenaed as a witness. He stated that he had known respondent for approximately a year and a half; that he was present at the home of appellant and respondent on April 2, 1953; that he had telephoned fifteen minutes before his arrival; and that he was there when appellant arrived home. On advice of counsel, he refused to answer all other pertinent questions on the ground that anything he might say might incriminate him.

Respondent testified that she had never been unfaithful to her husband; that she had not written the letter admitting unfaithfulness. She denied having improper relations with

the man (found upstairs) on April 2, 1953. She testified, "We were fully dressed." When asked what they were doing upstairs, she explained, "At that time our house was for sale, —was merely showing him the house."

■ The trial court did not believe respondent's testimony, nor do we. The record amply supports the finding of fact

"That the defendant [respondent] has been guilty of adultery, and having denied it, committed perjury."

This court has never hesitated to affirm an award of custody of minor children to a spouse who is without blame in the divorce proceedings (as in the instant case), when the other spouse has been shown to be an unfit parent. *Maple v. Maple*, 29 Wn. (2d) 858, 189 P. (2d) 976 (1948); *Paulson v. Paulson*, 37 Wn. (2d) 555, 225 P. (2d) 206 (1950); *Lynch v. Lynch*, 38 Wn. (2d) 437, 229 P. (2d) 885 (1951). Nor have we hesitated to reverse an award of custody of minor children to a parent when the record disclosed that the award to such parent would not be for the best welfare of the children. *Warnecke v. Warnecke, supra*, and cases cited; *Braun v. Braun*, 31 Wn. (2d) 468, 197 P. (2d) 442 (1948); *Atkinson v. Atkinson*, 38 Wn. (2d) 769, 231 P. (2d) 641 (1951); *Merkel v. Merkel*, 39 Wn. (2d) 102, 234 P. (2d) 857 (1951); *Guiles v. Guiles*, 41 Wn. (2d) 377, 249 P. (2d) 368 (1952); *Saffer v. Saffer*, 42 Wn. (2d) 298, 254 P. (2d) 746 (1953).

■ We have frequently held that a mother should not be deprived of the custody of children of tender years unless it is clearly shown that she is such an unfit and improper person that her custody of the children will endanger their welfare. See *Habich v. Habich*, 44 Wn. (2d) 195, 266 P. (2d) 346 (1954). This rule is neither inflexible nor axiomatic. Each case must be decided upon its own facts. *Chatwood v. Chatwood*, 44 Wn. (2d) 253, 266 P. (2d) 782 (1954).

■ In this case, as in *Braun v. Braun, supra*, there is no evidence that respondent's actions were the result of a *grande passion* or a deep infatuation. "It is just adultery reduced to the lowest common denominator" committed under the most matter of fact conditions. We cannot over-

look or condone respondent's conduct. See *Fitzgerald v. Leuthold*, 30 Wn. (2d) 402, 192 P. (2d) 371 (1948).

We are constrained to hold that it would endanger the future welfare of the children involved to permit them to be reared by one who displays such a flagrant disregard of morality, the law, a solemn oath, and the sanctity of the home. It is not proper that such a person guide the spiritual, mental, moral, and physical development of these children. It will endanger their welfare.

The evidence preponderates against the finding that the respondent is a fit and proper person to have the custody and control of David and William Christian.

Almost a year has passed since the trial of this action. At that time, appellant was the east coast promotional representative of a Washington company. The company manager testified that it was the present plan of the company to give appellant the opportunity to represent it in the Texas-Oklahoma area after the first of January, 1954.

Appellant's parents, who testified at the trial, live in a small town sixty-five miles from Dallas, Texas. The trial judge said in his memorandum opinion that they "appear to be cultured, decent, law-abiding, moral citizens." It was appellant's intention to have his parents care for his son, David, should custody be awarded to him. He would thus be able to spend considerable time with David.

William was born after the separation of the parties and after the commencement of this action. At the end of the trial, appellant's counsel suggested that William might be given to the custody of respondent's mother. Very little was presented to the trial judge in the way of an alternative disposition of the children. We do not feel from the record before us that we are in a position to say what should be done relative to the care and custody of these children. The trial court should be permitted to take further evidence regarding appellant's present circumstances and his ability to provide them with a proper home.

In summary:

(a) The portion of the decree awarding custody of the

two minor children to respondent is reversed, with directions to award their custody to appellant, if, upon the remand of this case, the trial court finds that appellant is able to provide a proper home for them. If the trial court does not so find, it shall make such provision for their care, custody, support, and control as it deems proper, which is not inconsistent with the views herein expressed.

(b) The case is remanded to the trial court for the purposes we have indicated.

(c) Appellant shall continue to pay respondent $62.50 per month for the support of each child until further decision in this case, at which time said payments shall cease.

(d) Except as herein set forth, the decree of divorce is affirmed.

Each party shall bear his own costs on this appeal.

GRADY, C. J., SCHWELLENBACH, HILL, and DONWORTH, JJ., concur.