CRUMP ET UX. *v.* MONTGOMERY ET AL.

[No. 35, September Term, 1959.]

*Decided October 21, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Hamilton P. Fox, Jr.,* with whom were *Hearne, Fox & Bailey* on the brief, for appellants.

*Herman E. Perdue* for Arthur P. Montgomery, et ux., and the Wicomico County Welfare Board, appellees.

*Alfred H. Carter, County Attorney,* and *Douglas H. Moore, Jr., Assistant County Attorney,* for Montgomery County Welfare Board, appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal by the petitioners below, Lloyd R. and Dorothy V. Crump, (the Crumps) from a decree entered by the Circuit Court for Wicomico County, dismissing the petition of the Crumps for the adoption of a minor child and decreeing the adoption of said child by Arthur P. and Blanche P. Montgomery, (the Montgomerys), who had also petitioned the court for the adoption of the child.

The child, Johnnie, was born in May of 1957 to an unwed mother. When he was seven days old, he was placed by the Montgomery County Welfare Board (Montgomery Board), which later received from his mother a written right to consent to his adoption, in the home of the Crumps, in Montgomery County, for foster care and pre-adoptive study. The Crumps had received five other foster children from the Montgomery Board and cared for them satisfactorily—not more than two being in their home at any one time. When first placed with the Crumps, it was thought Johnnie would

be placed for adoption within three to six months. However, they were notified in a few months by a welfare worker that he was not adoptable, because of his showing in his early psychological tests. In later psychological tests, the child showed such improvement (his rating was then slightly below average) that he was rated as eligible for adoption and the Crumps were informed of this fact in September of 1958. During the intervening months (about 15) that Johnnie had been in their home, the Crumps had become very much attached to him and strongly desired him to be their adopted son. Oral requests concerning the adoption of Johnnie were frequently made by the Crumps to the Montgomery Board worker, but they were told, as they had been before, that they were not eligible as adoptive parents, due to the fact that they were foster parents, and also because the Montgomery Board had "closed its adoption list." [1]

Following the determination that Johnnie was adoptable, his name was placed on the roll of children in that category with the State Welfare Department in Baltimore, which roll is designated as a child "Pool." The testimony does not make the method of operation of this "Pool" certain, but it seems that the children's names (probably minus their surnames), together with their backgrounds, are sent to Baltimore, where they are, in turn, sent to the various Welfare Boards throughout the state to be considered for adoption by prospective adoptive parents who have made application to them. Johnnie's name came to the attention of the Wicomico County Welfare Board (Wicomico Board), which had such an application from the Montgomerys, who had already adopted one child through that Board. The Wicomico Board notified the Montgomerys, who, after consultation with the Board, consideration of Johnnie's background and an interview with him in Montgomery County, decided they would like to have him as their adopted son.

---

1. There was nothing in the testimony to show how many applicants were on the list before it was closed, or that Johnnie was ever considered by any of them. The adoption work of the Montgomery Board is but a small portion of their over-all business.

Much time was consumed and testimony taken below concerning the conduct of the Montgomery Board in taking Johnnie from the Crump home and transferring him to Wicomico County; but, as we have so frequently said and repeated that in this class of cases the welfare and best interests of the child should be the paramount considerations of the Courts,[2] we eliminate many collateral facts and proceed as directly as possible to the real issues involved.

The Montgomery Board, over the protests of the Crumps, placed the custody of the child in the Wicomico Board for adoption, and thereafter, without any independent investigation of their own of the Montgomerys and without investigating the Crumps as possible *adoptive* parents, joined the Wicomico Board in consenting to the adoption of Johnnie by the Montgomerys.

Petitions for adoption were filed in the Wicomico County Circuit Court by both the Montgomerys and the Crumps. The Montgomery Board requested, and was granted, leave to intervene in the Montgomerys' petition; and, thereafter, the suits were consolidated for trial.

The testimony disclosed that Mr. and Mrs. Crump were 34 and 32 years of age, respectively, and had been married 12 years; they had one natural daughter, aged eleven, who was living with them; Mr. Crump had been an orphan himself and stated he desired to give some of the things that he had missed as a child to Johnnie; for the last six years they had lived in a modern brick bungalow in a desirable residential neighborhood in Silver Spring, Maryland; that Mr. Crump had been employed by the United States Government for nine years and was a scientist and engineer, receiving a salary of $7,200 per year, which was supplemented by approximately $5,000 per year, from his publications, inventions and private enterprises; one witness said that he was a "brilliant scientist"; that he was a steady, reliable and industrious worker; that Mrs. Crump was unemployed and spent her

---

2. See *Ex Parte Frantum,* 214 Md. 100, 133 A. 2d 408; *Winter v. Director,* 217 Md. 391, 143 A. 2d 81; *King v. Shandrowski,* 218 Md. 38, 145 A. 2d 281.

time in the care of the home, her child and the foster children; that neither Mr. nor Mrs. Crump indulged in alcoholic beverages and they were a compatible and congenial couple; and that the children in their home were receiving proper religious instructions.

In summary, the learned Chancellors below found that the testimony of "all of the witnesses who were familiar with the situation shows the Crump home to be an excellent one, * * * the care given to little Johnnie was all that could be desired, and no one, certainly not this Court, offers the slightest criticism of their conduct while the little boy was in their custody," but "[o]n the contrary, we wholeheartedly commend their conduct and what they have done for this little boy."

The testimony also disclosed that the Montgomerys are splendid people and maintain a nice home. Mr. Montgomery was 41 years of age—his wife 31—and they had been married about 15 years. They were living in a "comfortable, modest and attractive" home in a wholesome residential community on the outskirts of Salisbury, with one daughter—4 years of age—whom they had previously adopted. His home and automobile were fully paid for and he had money in the bank. The wife was a high school graduate, while the husband had stopped his formal education when through the eleventh grade, but had taken several vocational courses when in the armed services during the war. Mr. Montgomery had been employed by the Eastern Shore Public Service Company since 1948, starting as a member of a line crew and his "job," at the time of the hearing below, was "maintenance and utility." He received $2.18, per hour, from which he derived about $5,000 yearly. He and Mrs. Montgomery were, also, a compatible couple, who were attentive to, and mindful of, their children's welfare. She was unemployed and spent her time in the care of her home where she saw that the children were receiving proper religious training. The Chancellors expressed their "complete approval and satisfaction with Mr. and Mrs. Montgomery as well as with the home they maintain."

The Montgomery Board objected to the Crumps as adop-

tive parents for Johnnie on two grounds: first, that in their opinion the child would be "over-placed"; and, second, it had not investigated their home for adoptive purposes *in accordance with their policies*. The Montgomery Board, while it advocated the wisdom of its established policy (not consistently applied) of not considering foster-care parents as eligible to become adoptive parents, concedes that this policy is not binding upon a court, which has the final authority to approve or disapprove a proposed adoption.

The "over-placed" objection was based upon the fact that Mr. Crump was a well-educated, highly intelligent young man, who might, because Johnnie was slightly "below average" in his psychological tests, become dissatisfied with the boy and exert "pressure" upon him if the child were unable to exhibit a very high degree of intellectual ability.[3] The Chancellors expressed serious doubt upon this point, stating: "We are not altogether in agreement with the position that an intelligent man should be penalized by being prohibited from adopting a child whose home and background is not apparently up to his standard, and especially is this so when the child is only 18 or 20 months old, and any determination of the capacity of the child to grow in intelligence must be speculative at this stage of his life. * * *. On the face of the situation as we see it, without the ability to look in the future, it might well be that the possibilities offered in a home [such] as the Crumps under the guidance of a father with the education and with the ability he is said to have and the potentialities that might result from that might indicate that the young boy could and would approach the future and manhood and man's responsibilities better educated and better prepared to successfully meet the competition which all young men must meet eventually. *We would be inclined to say that such*

---

3. This objection is based on one of the elements that comes under a general heading usually termed "matching." Rule 517.1 of the Board of Public Welfare calls for "likeness in temperament, intelligence and racial heritage." 1 Schapiro, A Study of Adoption Practice, p. 84, lists ten factors considered as important in "matching."

*a home would be more beneficial to him."* (Emphasis supplied.)

With reference to the fact that the Montgomery Board did not investigate the Crumps as adoptive parents (a fact which, of itself, could have little, if any, bearing upon the outcome of the case), there can be little doubt that the Director and, at least, some of his workers knew the Crumps wanted to adopt Johnnie; and the Board's failure to make an adoptive investigation was due to its general policy not even to consider foster parents as prospective adoptive ones.

Had the matter of alleged over-placing been fully explored, it may have satisfied the Chancellors that their opinion, quoted above, was sound. It will be noted that the only testimony regarding the child's intellectual potentiality was the psychological tests given when very young. There was no other testimony concerning his background, other than that his mother was unwed. There was little of the hereditary background of any of the prospective parents given in evidence. And there was no professional investigation of the Crump home as an adoptive home, either by the Wicomico or Montgomery Boards or by an independent investigation directed by the court.

The results of Johnnie's early psychological tests would possibly be a matter of real concern as to his "over-placement" if they disclosed some serious impediment in his mentality, or if they could be correlated to his mental potential at any time in the future. However, while such tests are valuable in the ascertainment of a young child's current development, when given at the ages Johnnie's were, the text-writers and agencies seem to agree that they have small predictive value and bear little, if any, relation to a person's later or ultimate level of mental attainment; and there is no reason to conclude that a very young child, who shows slightly below average in such tests, will develop only a prosaic type of mind rather than one of keenness and alertness. Director Boyd R. McCandless, Ph. D., of the Iowa Child Welfare Research, sums the matter up as follows: "In summary, there is at this time no wholly satisfactory evidence that [psychological] tests given babies before the age of, at the

earliest, eighteen months will predict later intellectual status in any useful sense." [4]

In considering further the relative intellectual powers of the prospective adoptive father, Mr. Crump, and the boy, it was noted above that it was suggested that because Mr. Crump is a well-educated, intelligent man he might, if permitted to adopt Johnnie, become dissatisfied with the union and exert undue pressure upon the boy if he failed to attain a high level of mental development. In order to give this its proper relative importance, it should be noted that the intellectual feature of matching is only one of many factors, such as race, religion, physical likeness, etc., that should be considered under the general heading of "matching adoptive parents with adoptive children." J. Richard Wittenborn, University Professor of Psychology and Education, Rutgers University, deals with the subject on pp. 131, 132, 133 of his book, *The Placement of Adoptive Children* (1957). He states that in the tests that he had conducted, the psychologists' interviews with adoptive parents disclosed that "exceptional ability or achievement on the part of the adoptive child was never emphasized by the adoptive parents" and "[o]ur samples provide no reason for believing that adoptive parents characteristically depend upon exceptional talents or ability in adoptive children." He continues by stating that if a congruence between the ability of the child and the educational-occupational status of the home be important, we should find evidence for the ability of the adoptive father to accept the child easier in the families where there is a congruence than in the ones where there is an incongruence. He, therefore, divided his testing families into four groups: two where there presumably was a congruence between the

---

4. McCandless, Psychological Assessment in Infancy and Very Early Childhood, p. 3. See also, Anderson, "The Predictive Value of Infancy Tests in Relation to Intelligence at Five Years," Child Development, pp. 202-210; Jones, "The Environment and Mental Development", Carmichael, Leonard (Ed.), Manual of Child Psychology, pp. 631-696; 1 Schapiro, A Study of Adoptive Practices, pp. 56, 57; New Approaches in Adoption, Proceedings of the Maryland Adoption Conference (1956) pp. 35, 36.

children's Binet IQ and the educational-occupational status of the adoptive father, and two where there was an incongruence. He describes the result as follows:

> "We had argued that we might expect that the families in which there was congruence would be the most satisfied. Actually, this expectation was not fulfilled. We found no differences among our four groups with respect to parental satisfaction as indicated by such criteria as criticism of the child, desire that the child should be different in some respects, time spent with the child, etc.
>
> Thus our analysis fails to show any relationship between the pattern of congruence and the acceptance of the child."

Schapiro, *op. cit.,* Vol. 1, p. 84, recognizes that matching is an important part of agency practice in adoptions, but points out there is "no one rule for appraising the qualitative contributions that any single factor can make to the general atmosphere of a home, as [t]here is no unanimity of opinion on what constitutes sound matching," and "matching has become more flexible because agencies have begun to recognize that some adoptive parents are frequently able to accept differences." See also, *Child Welfare League of America Standards for Adoption Service,* p. 23, par. 4.3, "Matching."

Thus, we have two families that have been passed as eligible for adoptive purposes—both desiring to adopt the same child. The *Child Welfare League of America Standards for Adoption Service,* p. 23, says the selection of a family for an adoptive child should be made on the basis of an appraisal of their suitability for each other, and suitability "should be appraised in terms of the capacity of adoptive parents to meet the individual needs of the particular child, and of the child to benefit by placement with them and to bring them the satisfaction of parenthood." It will be noticed the emphasis here is on the benefit to the child, and seems to be tantamount to what the law considers "the welfare and best interests of the child."

In making short qualitative analyses of the two families in-

volved herein, we make no reference to the qualifications where they seem to be equal, but only to those that differ. The Crumps have the better educational-occupational status (unless it is ultimately determined that the mental attainments of Mr. Crump will probably interfere with his accepting the child, or that he is likely to exert undue pressure upon the child to attain a level of mental development of which the child is incapable); they have a larger income, $12,200, per year, as compared to $5,000; they have a slightly better residence; and Mr. Montgomery demonstrated in his testimony that he does not speak grammatically in simple, ordinary statements of speech. On the other hand, the daughter of the Montgomerys was nearer the age of Johnnie than the daughter of the Crumps (4 years as compared to 11), and Mr. Montgomery's mental development is not such as to raise any question about his accepting the child.

Another matter that the Chancellors should have thoroughly considered and weighed is that the adoption of Johnnie by the Montgomerys involved a change from the home, locality and environment in which he had been, practically, since birth.

In what we have said above, we have outlined some of the thinking of, and the results of tests made by, those who have specialized in child placement; because the Chancellors below, after stating their opinion which is, in part, quoted above, stated that they hesitated "to ignore these carefully considered opinions of the Welfare Board and *act upon our feelings in the case.*" They then stated: "As opposed to that [their own opinion that the Crump home would probably be more 'beneficial' to Johnnie than the Montgomerys] we have what we are certain is the conscientious opinion of people who are long experienced in welfare work, * * * and who must be considered by us to be better prepared *to make a decision for this boy in this case* for his future welfare. * * * We hesitate to put *our opinion against theirs.* * * *. With that feeling, *relying* on what we think is or may be superior judgment, * * * and with as much reluctance as we have to say no to such fine people as the Crumps, we feel * * * that we should *not supplant the judgment of the Board*

as to which family is better able to give this child that which it is entitled to have in this life." (Emphasis supplied.)

Thus, it is plainly seen that the Chancellors adopted the decision and judgment of the Montgomery Board as to which family would better subserve the welfare and best interests of Johnnie by his adoption, and made no actual finding of their own upon the subject, although clearly intimating that their conclusion was contrary to the Board's. Code (1957), Article 16, Section 68, places the responsibility for the granting of adoptions in the counties of this State upon the Circuit Courts, and, in granting adoptions, it is the duty of said courts to determine what will best promote the welfare and interests of the child. Of course, the Chancellors were at liberty in this case to receive reports and recommendations from Welfare Boards and other qualified persons and boards, and to give to those reports and recommendations such reasonable weight as, in their judgment, they deemed proper; but, after all the evidence was in and arguments heard, it was the function, duty and responsibility of the court ultimately to decide what was for the best interests of the child; and this duty and obligation cannot be abnegated in favor of any board or person.

In view of the fact that the Chancellors failed to make a definite finding of their own with reference to the welfare and best interests of the child, and the testimony in regards to certain aspects of the case is not so complete as it might be, as previously indicated in this opinion, we have decided, under Maryland Rule 871 a, to remand the case without affirmance or reversal so that the court below may take such additional testimony as it desires, have an independent investigation made of the prospective adoptive parents and the infant if it deems the same necessary or desirable, and render a final and definitive finding, insofar as that court is concerned, as to what will best serve the welfare and best interests of Johnnie. And, as this is an adoption case, that determination will be made as of the time that decision is made and not as of the time of the first hearing. Cf. *King v. Shandrowski,* 218 Md. 38, 145 A. 2d 281.

The natural mother has filed a petition in this Court which

may be considered in the nature of a petition to permit her to intervene. At the time of the trial below, her consent to adoption given to the Montgomery Board was over one year old, and she alleges that she had no actual notice of the proceedings below. As the cause is being remanded, she may petition the trial court for any relief to which she feels she is entitled.

> *Cause remanded without affirmance or reversal for further proceedings in accordance with this opinion, costs to abide the result.*