## HILD *v.* HILD

[No. 10, September Term, 1959.]

350

352

*Decided January 25, 1960.*

*Motion for rehearing filed February 24, 1960, denied March 14, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*J. Francis Ford* for the appellant.

*W. Giles Parker* for the appellee.

HORNEY, J., delivered the opinion of the Court.

It has been said that the courts have no greater responsibility or more difficult problem than to decide a question respecting the custody of a child.[1] The statement is as applicable to an appellate court as it is to a court on the *nisi prius* level. This appeal is certainly not an exception. The father of a seven-year old boy has appealed from a custody decree in a case in which the chancellor, having previously found the mother guilty of adultery and granted the father a divorce, subsequently awarded the custody of the child to the mother. The mother had married the second of two paramours almost immediately after the divorce decree and several months before the date of the custody decree.

---

1. See *Varney v. Trout,* 232 Ky. 513, 23 S. W. 2d 944 (1930); 2 Nelson, *Divorce and Annulment,* § 15.01 (2d ed., 1945).

The litigants were married in April of 1951 and the child was born in April of 1952. As early as 1953 the parties had marital difficulties and the wife left the husband and filed suit for a divorce. Later, when the husband was about to be inducted into the armed service, a reconciliation was effected. During the time he was stationed at training centers in this country, particularly while he was in Texas, the parties lived together with their son until the husband was sent overseas to Korea. After the husband was discharged from the service in October of 1955, the marital relationship was resumed for approximately three days, but came to an abrupt end when the wife informed the husband that she no longer cared for him and ordered him to leave the home of her parents where they had been sojourning. The wife retained custody of the first born son, and a second son was born to her in July of 1956. The husband did not seek custody of the second child because he believed that it was not his.

In January of 1956 the wife filed another bill in the Circuit Court for Baltimore County on the grounds of abandonment and desertion and sought an absolute divorce, and in the alternative a partial divorce, and custody of the first born child. The husband countered with a cross-bill on the ground of adultery and also sought custody of the child.

It would serve no useful purpose to relate the details of the adulterous relationships and other indiscretions of the wife. The chancellor believed the wife had not been truthful, had testified falsely as a witness and had committed perjury. He found that she had been guilty of adultery with two men and that she was then living in open adultery with one of them. During the course of his oral opinion the chancellor stated that the father of the older boy was a man of excellent character and had testified to the truth. He also stated that the paternal grandmother of the older boy was a woman of exemplary character and that he believed her testimony. The chancellor was further of the opinion that the maternal grandfather and grandmother of the boys were excellent people, but he thought they had not told all they knew of their daughter's conduct and had concealed more than they had revealed. He added, however, that he appreciated

their reluctance to testify about their daughter, that he sympathized with their difficult situation, and that he did not hold their hesitation or timidity against them.

On July 8, 1958, nearly four months after hearing the divorce actions in open court, the chancellor granted the husband an absolute divorce from his wife, but he reserved the custodial question and awarded temporary custody of both children to the wife with visiting rights to the husband under supervision of the probation department of the court. The divorced wife did not appeal from the divorce decree.

On October 1, 1958, approximately three months later, the chancellor passed the custody decree by which, although he was not impressed with the mother's character, he decided that the best interests of the older child impelled him to continue temporary custody with the mother under strict supervision and with more extensive visitation rights to the father. It was from this decree that the present appeal was taken by the father.

Prior to hearing testimony on the divorce actions, the chancellor had caused the chief probation officer to investigate the home of the wife as well as that of the husband and his mother. The officer testified in open court that he had made three surprise visits to the wife's home and that on each occasion he had found the children happy, healthy and well cared for. When he was asked by the court to express his opinion as to the desirability of separating the children, he confessed that he was not an expert in that field and doubted his competence to comment thereon, but went on to say that from a "physical standpoint" it would be a tragedy to take them from their mother or to "split them up." And when he was pressed as to the effect on the children of the mother's promiscuity in her sexual relations, he was of the opinion that the mother would put the welfare of the children first and that her past conduct would not reflect on them in the future. At the time of these visits the mother and the paramour she later married were living together as man and wife. The officer further testified that he had visited the home of the husband and his mother and made inquiries in the neighborhood as to their standing. As a result of this investigation

he was satisfied that their home would be an "excellent environment" in which the boy would be "excellently cared for."

There was no other testimony by official or disinterested witnesses bearing on the question of custody. However, there were in the transcript two written reports of an assistant who took over where the chief probation officer left off, but they had not been included in the printed appendix. It was for this reason, with the approval of counsel for both parties, that we ordered all written reports and recommendations of the probation officers, as well as summarizations of such reports and recommendations as had been made orally to the chancellor, to be made a part of the record on appeal. This was done. Some of the reports were in writing initially and others had been made orally from written notes made at the time of each interview.[2] The three conferences which the chancellor had with the chief probation officer took place after the court hearing, but before the passage of the custody decree, and for the most part were merely an elaboration of what he had testified to in court. The only pertinent reports of the assistant probation officer considered by us were made between the date [October 1, 1958] of the custody decree continuing temporary custody and the date [March 20, 1959] of the supplemental opinion, filed with the transcript of the testimony taken in open court, which supplemental opinion was in effect a renewal or affirmation of the custody decree continuing temporary custody. Primarily such reports involved visits made by the assistant to the mother's home and the boy's school.

Despite the mother's lack of cooperation with the probation department—with respect to the visiting rights of the father which she refused to facilitate except when it suited her—and her past indiscretions, the assistant too was of the opinion that the welfare of the older boy would best be served by

2. Concerning the reports and recommendations of investigators, we deem it appropriate to observe that judicial discretion with respect to the use thereof as evidence is not without limitations. See, for example, 2 Nelson, *op. cit., supra,* § 15.48, and the cases therein cited.

staying with his mother. He also found the boy to be happy, healthy and well adjusted with his stepfather, his brother, his mother and in school. The mother was seeing that the boy received some religious training though he had difficulty distinguishing the difference between the public school and the church school. The child expressed a desire to visit his father, but not to stay overnight, and preferred to stay most of the time with his mother, his brother and his dog. While it is undoubtedly true that both parents sparred for the boy's affections without considering the feelings of the other parent, there is no doubt that the mother had deliberately endeavored to prejudice the child against the father. Moreover, as so often happens, the parents, in discussing their respective situations in front of the boy, demonstrated their hatred of each other and considered their own wounded pride rather than the boy's welfare.

In the supplemental opinion filed March 20, 1959, the chancellor, in addition to remarking that he had great respect for, and confidence in, the probation officers and the director of the probation department, who had also given the question of custody considerable thought, stated that "[t]he probation officers and the Court have come to the unanimous opinion [3] that it is in the best interest of this child [the oldest son] to remain with the mother, * * * with liberal visiting privileges for the father * * * [so that he] should have an opportunity to see much of the child, to remain in close contact with him and to have the child in his custody over weekends so that he can see that the child receives the religious training which he wishes the child to have." The chancellor was apprehensive that "to disrupt the child's life at this time by placing him in a different environment might have a most unfavorable influence upon the little boy." Recalling his remarks concerning the mother's veracity, the chancellor recognized that

---

3. With respect to the opinions expressed by the probation officers in their testimony and in the written and oral reports to the chancellor, we stated in *Crump v. Montgomery*, 220 Md. 515, 154 A. 2d 802 (1959) [an adoption proceeding], that the welfare department reports were properly considered by the court, but that only the court should have made the final decision.

he had been "rather severe," but reiterated that the child "should continue to live with her as at present."

At the common law the father was generally entitled to the custody of his minor children, but in the absence of statutory requirements to the contrary, modern courts invariably hold that the best interests and welfare of the child should be primarily considered in making an award of custody. *Carter v. Carter,* 156 Md. 500, 144 Atl. 490 (1929).

As we observed at the outset, the task of awarding the custody of children is an exacting one. Usually the difficulty does not arise from the state of the law, for the law on the subject, though still developing, is well settled. On the contrary, the real dilemma generally stems from the endeavor to apply the established principles of law to the facts and circumstances on which the decision is based.

For the purpose of ascertaining what is likely to be in the best interests and welfare of a child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. 2 Nelson, *Divorce and Annulment,* § 15.01 (2d ed., 1945). It stands to reason that the fitness of a person to have custody is of vital importance. The paramount consideration, however, is the general overall well-being of the child.

Since the mother is the natural custodian of the young and immature, custody is ordinarily awarded to her, at least temporarily, in legal contests between parents when other things are equal, even when the father is without fault, provided the mother is a fit and proper person to have custody. *Trudeau v. Trudeau,* 204 Md. 214, 103 A. 2d 563 (1954); *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908 (1958); Madden, *Persons and Domestic Relations,* pp. 377-78 (1931); 2 Nelson, *op. cit., supra,* § 15.09.

But the general rule favoring a mother, even where the child is young and immature, is not inflexible and ought to

give way to the exigencies of the situation in every case where there are circumstances which require application of the fundamental rule that the paramount consideration is the best interests and welfare of the child. *Com. of Pa. ex rel. Kreiling v. Kreiling,* 156 Pa. Super. 526, 40 A. 2d 704 (1945). In such circumstances, particularly where it is demonstrated that the mother is not a fit and proper person, custody ought to be awarded to the father, or some other person. *Watkins v. Watkins,* 221 Ind. 293, 47 N. E. 2d 606 (1943).

Ordinarily, when a divorce is granted on the ground of adultery, the custody of the child is usually awarded to the innocent party, not as a matter of punishment or reward, but because it is assumed that the child will be reared in a cleaner and more wholesome moral atmosphere. *Swoyer v. Swoyer,* 157 Md. 18, 145 Atl. 190 (1929). The courts generally— in this state as well as those in other jurisdictions—refuse to permit children to be awarded to or remain with a mother who has been guilty of adultery. See the long line of cases beginning with *Hill v. Hill,* 49 Md. 450 (1878), and ending with *McCabe v. McCabe,* 218 Md. 378, 146 A. 2d 768 (1958).[4] The rule is not absolute, however, for when the adulterous relationship has ceased and appears unlikely to be revived because the mother has changed her way of living, her past indiscretions may be overlooked. *Oliver v. Oliver, supra.* We think the past decisions of this Court require a strong showing to be made to overcome the usual rule against awarding custody to an adulterous mother. The fact that she subsequently marries the paramour has not been regarded as meeting the requirements of such a showing. See *Pangle v. Pangle,* 134 Md. 166, 106 Atl. 337 (1919); *Stimis v.*

---

4. The list, in addition to the *Hill* and *McCabe* cases, *Swoyer v. Swoyer, supra,* and *Pangle v. Pangle* and *Stimis v. Stimis,* both *infra,* includes *Kremelberg v. Kremelberg,* 52 Md. 553 (1879); *Crane v. Crane,* 128 Md. 214, 97 Atl. 535 (1916); *Pryor v. Pryor,* 146 Md. 683, 131 Atl. 47 (1924); *Cashell v. Cashell,* 153 Md. 170, 137 Atl. 904 (1927); *Durr v. Durr,* 161 Md. 66, 155 Atl. 188 (1931); *Pekar v. Pekar,* 188 Md. 360, 52 A. 2d 468 (1947); *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765 (1954). See also *Atkins v. Gose,* 189 Md. 542, 56 A. 2d 697 (1948) [adoptive parents].

*Stimis,* 186 Md. 489, 47 A. 2d 497 (1946) ; *McCabe v. Mc-Cabe, supra.* See also *Johnson v. Johnson,* 215 Ala. 487, 111 So. 207 (1927). Cf. *Hager v. Hager,* 309 Ky. 803, 219 S. W. 2d 10 (1949).

There are in this case two other factors, which under different circumstances might require more consideration, but are relatively unimportant here. One concerns the preference of the child to stay with his mother, his brother and his dog. The desire of a child, who has reached the age of discretion, to be with one parent rather than the other, though not controlling, should be given consideration. However, the seven-year old boy, who is the subject of this controversy, has not yet reached the age when he may rationally express a preference. The remaining factor involves the separation of the older brother from the younger sibling. Ordinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof. *Kartman v. Kartman,* 163 Md. 19, 161 Atl. 269 (1932) ; *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949) ; *Roussey v. Roussey,* 210 Md. 261, 123 A. 2d 354 (1956). But when separation becomes necessary or inevitable, as it has in this case, there is no reason why it should not be done. 2 Nelson, *op. cit., supra,* § 15.18.

Maryland Rule 886 provides in substance that we may review a case "upon both the law and the evidence, but the judgment * * * [should] not be set aside on the evidence unless clearly erroneous and due regard * * * [must] be given to the opportunity of the lower court to judge the credibility of the witnesses." Under this rule a decree awarding custody of a child is in the same posture on appeal as a judgment in any other case tried by the lower court without a jury. In all such cases the finding of the lower court is entitled to great weight and will not lightly be set aside. However, in a case such as this, even though the facts are virtually undisputed, we have the further function of deciding whether the decision of the lower court was the correct one under the law as applied to such facts. As a general rule, as herein stated, the custody of a child, especially one of tender years, is awarded to the mother. There is an exception, among others,

where the father has been granted a divorce based on the adultery of the mother, but even this exception is not absolute and the facts and circumstances in each case must be considered. It is clear, however, that as a matter of law there is a strong presumption against the fitness of an adulterous parent to retain or obtain custody of his or her child. However, this presumption runs only to the question of the fitness of the guilty spouse. It does not constitute an absolute bar nor does it establish the desirability of the innocent party. The presumption is based on what is deemed to be for the best interests and welfare of the child and not on a system of punishment and reward.

In this case we think the presumption against awarding custody to the wife guilty of adultery has not been overcome. Though the chancellor decided to award custody to her notwithstanding the impression which he clearly expressed at the conclusion of the trial—that she was thoroughly untruthful—we think that her untruthfulness is not to be completely overlooked (even after considering the regrettable frequency of departures from the truth in divorce proceedings). Nor do we think that her rather obvious efforts to poison the child against his father and her non-cooperative, if not obstructionist, attitude towards the exercise of the husband's rights of visitation, or her non-cooperation with the probation department indicate a character or disposition which inspire confidence in her as a fit person to have custody of the child. In this instance, as was said by Chief Judge Brune for this Court in *Ex Parte Frantum,* 214 Md. 100, 133 A. 2d 408 (1957) [an adoption case], we "must exercise * * * [our] best judgment in determining whether the conclusion reached by the Chancellor was the best one." We think it was not.

We said in *Miller v. Miller,* 191 Md. 396, 408, 62 A. 2d 293, 298 (1948), and repeated it recently in *McCabe v. McCabe, supra,* that "[w]e must look to the future welfare of this infant. In making our decision we should not gamble about that future. We can only judge the future by the past." Here, too, we think we should not gamble because it might endanger the future welfare and best interests of the seven-year old boy—who is the real victim of the conduct which

brought about the divorce—to permit him to be reared by one who has displayed a flagrant disregard of the law of the land, including the sanctity of an oath, as well as the moral code,[5] which is well nigh universally accepted by our society. Such a person should not be entrusted to guide the physical, spiritual and moral development of the child. *Christian v. Christian,* 45 Wash. 2d 387, 275 P. 2d 422 (1954).

For the reasons stated, we hold that custody of the child should have been awarded to the father with reasonable rights of visitation to the mother. The decree will be reversed and the case remanded for the entry of a decree in conformity with this opinion.

> *Decree reversed and case remanded for the entry of a decree in conformity with this opinion, the appellant to pay the costs.*

HAMMOND, J., filed the following dissenting opinion, in which HENDERSON, J., concurred.

The immediate holding in the case does not impel me to dissent, nor would I have noted disagreement if the chancellor had given custody to the father and my colleagues had affirmed, because a disagreement as to the correctness of the result in a case rarely makes a dissent warranted or wise. I am constrained to note the reasons for my disagreement in this case because the opinion can mean only that, as a matter of law, no woman who commits adultery can ever thereafter be considered fit to have custody of her child, regardless of other conditions and circumstances, and I feel that this proposition is neither tenable nor defensible, whether considered as reflecting the mores and beliefs of the community, as a matter of morality, or as abstract law.

The majority decision builds a legal wall that can in fact neither be climbed nor breached between a mother who has committed adultery and her children. The only possible

---

5. Commonly known as the Decalogue or Ten Commandments. See *Exod.* 20:1-17; *Deut.* 5:6-21.

opening (if "the adulterous relationship has ceased and appears unlikely to be revived because the mother has changed her way of living, her past indiscretions may be overlooked, *Oliver v. Oliver, supra*") has been closed, in operative effect, by the statement and holding of the opinion that the "usual rule against awarding custody to an adulterous mother" is not overcome "by the fact that she marries the paramour * * *. See *Pangle v. Pangle,* 134 Md. 166."

That the decision in the case was—and could only have been—based on a presumption that adultery and subsequent marriage to the paramour in themselves make the mother unfit to have custody, without reference to whether the mother's character, traits, habits, and abilities in fact constituted her able and likely to give the child the rearing and training that would make her custody in his best interests. The opinion says that the paramount consideration of the best interest and welfare of the child is to be tested by considering the fitness of the custodian, the age and sex of the child, the physical, spiritual and moral well-being of the child, and the environment and surroundings of the child. The majority point out that ordinarily a young child will remain with the mother and that brothers should not be separated. In the instant case all the factual and legal tests justifying custody in the mother are met, unless the adultery and the subsequent marriage alone nullify them.

The mother has had the boy for all of his seven years. He is a healthy, wholesome, happy and well-adjusted youngster. He is fond of his stepfather and his brother and they of him. His environment is completely satisfactory physically and otherwise. Two experienced and competent probation officers and the Director of the Probation Department, who have become personally familiar over a period of several years with the father, the elderly grandmother who will now have the child, the mother, the boy, his mother, his stepfather, and his teacher, think the child's best interests lie in his custody with the mother. Fully weighing her weaknesses and failings, as did Judge Gontrum in making his own independent decision, based on the full and adequate facts and data supplied him, they found that the past misconduct would not

in the future reflect on the children, that the mother would put the welfare of the children above everything else, and that the interests of the contested child would best be served if he remained with his mother.

All the facts and all the law say Judge Gontrum was right unless the adultery and the marriage to Fadely overcome every other consideration, and alone, as presumptions against fitness, (that were not shown to have created unfitness in fact) are decisive and controlling.

The majority opinion says that this Court must judge the future by the past and not gamble with the child's welfare in the years to come. The past has seen the growth of a happy, well-adjusted, healthy child. Moreover, the equity court continually supervises the situation and can change custody if a change in conditions indicates that the child's welfare requires it.

Mankind has made progress towards the exercise of the spirit of Christ when He said to the woman caught in the act of adultery: "Neither do I condemn thee, go and sin no more" (John 8:3-11). The days of the rule of public and private vengeance, when an adulteress was stoned or made to wear the scarlet letter A in the pillory, have passed. It has even progressed, I believe, since the time when this Court engaged in solemn and serious discussion as to whether a mother who had committed adultery should be permitted even to see her children. *Hill v. Hill,* 49 Md. 450; *Kremelberg v. Kremelberg,* 52 Md. 553. See 3 Westermark, *The History of Human Marriage,* 362.

It should have progressed to a point where the Court will not lay down a rule of law that in operative effect means (in spite of lip service as to possible exceptions) that a woman who commits adultery demonstrates her permanent unfitness for custody. The majority opinion, as I read it, will be an ever present warning to *nisi prius* judges that, in operation, it overrules *Oliver v. Oliver,* 217 Md. 222, and *Trudeau v. Trudeau,* 204 Md. 214, although professing not to do so, and forbids awards to a mother who has erred.

I do not suggest that adultery is a recommendation for fitness as custodian—in *McCabe v. McCabe,* 218 Md. 378, I

concurred fully that the adulterous mother had shown character and traits that made her obviously unfit to have the daughter despite the fact that she had married the latest man. I say merely that the decision should be made by the trier of fact on the circumstances in relation to the individuals involved in each case, and that this on-the-spot determination, as a result of personal appraisal, should not be reversed on appeal unless clearly wrong on the facts, and never because of a presumption of error arising from the fact of adultery alone.

Particularly untenable is the philosophy of the opinion that the "mere fact" of the mother's marriage to the paramour is not only of no persuasive force in showing fitness for custody, but actually compounds or adds to her unfitness. That this is the philosophy is revealed by the Court's reliance on the point in *Pangle v. Pangle,* 134 Md. 166. That opinion said it was not just or right to humiliate the innocent party who has lost his spouse by requiring the surrender of the children to the "author of the marital misfortune." What has this to do with best interests and welfare of the child? It is purely a facet of the vengeance theory. The wounded pride and lacerated feelings of the offended spouse are to be salved by the hurting of the offender in the taking away of the child. If this happens to coincide with the best interests of the child, no harm is done; if it does not, as often it will not, the cardinal and right rule of the child's welfare as paramount is violated. Such reasoning, particularly where, as here, the new spouse had nothing to do with the marital break-up, seems to me to fly in the face of common sense. Certainly it is better for a couple to marry and in law be man and wife than to live together without benefit of clergy.

I think applicable the words of Sir Henry Duke, then President of the Probate, Divorce and Admiralty Division of the High Court of Justice, in *Wilson v. Wilson,* Prob. [1920] 20, in connection with a husband who had committed adultery with a friend of the family, "a respectable woman," one Amelia Brown, who had come to take care of his children of a broken home. They had a child, and continued to live together as a family with all the children. The court granted

him a divorce from his wife who had also committed adultery, and said: "I have come to the conclusion that on the whole there are in this case circumstances which warrant the exercise of the judicial discretion in his favour. These are (1.) the position of the children to whose interest it is that they should have a home with the sanctions of decency and, so far as may be, of the law; (2.) the position of Amelia Brown, for it is clearly in her interest that she should be lawfully married; (3.) the case of the respondent, who long ceased to have any relations with the petitioner, and as to whom there is no prospect that my refusal of relief would have the effect of reconciling her to her husband; and, (4.) the case of the petitioner; it is in his interest that he should be able to marry and live respectably."

I would affirm. Judge Henderson concurs with the views herein expressed.